1          IN THE DISTRICT OF THE UNITED STATES OF AMERICA
              FOR THE SOUTHERN DISTRICT OF ILLINOIS

2   _____
                                      )
3   **UNITED STATES OF AMERICA**,         )
                                      )
4                   Plaintiff(s),     )
                                      )
5        vs.                          )   Case No. **09CR30181-DRH**
                                      )
6   **JOSE LUIS CALVO-SAUCEDO**,          )
                                      )
7                   Defendant(s).     )
    _____)

8

9                      **MOTION TO SUPPRESS**

10

11    BE IT REMEMBERED AND CERTIFIED that heretofore on  **3/10/2010**,
   the same being one of the regular judicial days in and for the
12   United States District Court for the Southern District of
   Illinois, Honorable David R. Herndon, United States District
13   Judge, presiding, the following proceedings were recorded by
    mechanical stenography; transcript produced by computer.

14

15

16                       **APPEARANCES**:

17   ***FOR PLAINTIFF***: **Daniel T. Kapsak**, Assistant U.S. Attorney -
   Fairview Heights, 9 Executive Drive, Suite 300, Fairview
18   Heights, IL 62208

19

   ***FOR DEFENDANT***: Todd M. Schultz, Federal Public Defender, 650
20   Missouri Avenue, Suite G10A, PO Box 159, East St. Louis, IL
   62202

21

22

23   ***REPORTED BY***:  **Molly N. Clayton, RPR**, Official Reporter for
   United States District Court, SDIL, 750 Missouri Ave., East St.
24   Louis, Illinois 62201, (618)482-9226,
                   *molly_clayton@ilsd.uscourts.gov*
25

**INDEX OF WITNESS EXAMINATION**

|  | DX | CX | R-DX | R-CX |
|---|---|---|---|---|
| Calvo-Saucedo, Jose Luis .......78 | | 79 | | |
| Thebeau, Kevin .................5 | | 38 | 69 | 76 |

**INDEX OF EXHIBITS**

| EXHIBIT | DESCRIPTION | Id'D | Rcv'd |
|---|---|---|---|
| Gvt Exhibit 1 | Photo, vehicle .............12 | | |
| Gvt 1 | | | 12 |
| Dft 1B | | | 79 |
| Gvt Exhibit 2 | Photo, passenger side of ...23 vehicle | | |
| Gvt 2 | | | 24 |
| Dft 2 | | | 45 |
| Gvt 3 | Photo, bottom of vehicle ...30 | | 30 |
| Gvt 4 | Photo, car panel and bundles33 | | 33 |
| Gvt 5 | Photo, passenger side of ...34 vehicle with ground effects removed | | 35 |
| Gvt 6 | Photo, passenger side rocker36 panel | | 37 |
| Dft 6 | Photo,  Pontiac Grand Am ...59 | | 59 |
| Dft 7 | Photo,  Pontiac Grand Am ...59 | | 59 |
| Dft 8 | Photo,  Pontiac Grand Am ...59 | | 59 |
| Dft 9 | Photo,  Pontiac Grand Am ...59 | | 59 |
| Dft 10 | Photo,  Pontiac Grand Am ...59 | | 59 |
| Dft 11 | Photo,  Pontiac Grand Am ...59 | | 59 |
| Dft 12 | Photo,  Pontiac Grand Am ...59 | | 59 |
| Dft 13 | Photo,  Pontiac Grand Am ...59 | | 59 |
| Dft 14 | Photo,  Pontiac Grand Am ...59 | | 59 |

**MISCELLANEOUS**

| | PAGE |
|---|---|
| Argument, prosecution | 80 |
| Argument, defense | 87 |

1          *THE COURT:*  Let the record reflect we're in open

2     court.  Call the matter of United States of America versus Jose

3     Luis Calvo-Saucedo, 09-30181.

4          The government present represented by Assistant United

5     States Attorney Daniel Kapsak.

6          The defendant present in court together with his

7     counsel Todd Schultz.

8          Good morning, gentlemen -- afternoon, gentlemen.  Good

9     day, gentlemen.

10         *MR. SCHULTZ:*  Afternoon, your Honor.

11         *MR. KAPSAK:*  Afternoon, your Honor.

12         *THE COURT:*  We call this matter for the defendant's

13    motion to suppress.  The defendant, as I said, is in court and

14    he's -- seated next to him, for purposes of translation,

15    Fernando Torres.

16         Mr. Torres, I need you to stand and take your oath as

17    a translator.

18         *MR. TORRES:*  Yes, your Honor.

19    *FERNANDO TORRES was sworn to translate the proceedings from the*

20       *English language to the Spanish language and vice versa.*

21         *MR. TORRES:*  I do.

22         *COURTROOM DEPUTY:*  Thank you.

23         *THE COURT:*  Thank you, Mr. Torres.

24         *MR. TORRES:*  Thank you, your Honor.

25         *THE COURT:*  Mr. Torres, is this the first time you

1    have met the defendant?

2         MR. TORRES:  No, your Honor.  I think I met him in the

3    initial appearance before, yeah.

4         THE COURT:  Okay.  Since this is, as I said, a motion

5    to suppress and the issues at hand deal with a traffic stop and

6    a warrantless search based on alleged consent, before we begin,

7    though -- and I'll turn to the government first since it is a

8    warrantless search -- but for purposes of narrowing the issues

9    in looking at your motion and your memorandum, Mr. Schultz, I

10   take it there is no issue with respect to the validity of the

11   traffic stop.  That's true?

12        MR. SCHULTZ:  It is, your Honor.

13        THE COURT:  And also there's no contest that your

14   client gave an initial consent.  Your issue is with the scope

15   and the breadth of that consent and whether or not the police

16   officers went beyond what you believe to be the scope and

17   breadth of that consent in the initial part of the search of

18   the car.  Is that what we are really focusing on?

19        MR. SCHULTZ:  Your Honor, I feel like you have

20   accurately summarized the issue.

21        THE COURT:  So as I said, it is a warrantless search.

22   And I know, Mr. Kapsak, you raise an issue, which at some point

23   shifts the burden to the defendant with respect to whether or

24   not the defendant should have called a halt to the search.  You

25   put that in your memorandum.  But at least for the initial part

1    of the issues, I think that the burden is on you to present

2    proof regarding whether or not the totality of the

3    circumstances warrant the nature of the search.  And you would

4    agree with that?

5              *MR. KAPSAK:*  Yes, Judge.

6              *THE COURT:*  All right.  So why don't you proceed.

7              *MR. KAPSAK:*  Thank you.

8         The government calls Officer Kevin Thebeau.

9              *COURTROOM DEPUTY:*  Do you solemnly swear that the

10   testimony you are about to give shall be the truth, the whole

11   truth, and nothing but the truth, so help you God?

12             *THE WITNESS:*  I do.

13             *COURTROOM DEPUTY:*  Would you please be seated and

14   state your name and spell your last name, please.

15             *THE WITNESS:*  My name is Kevin Thebeau.  Spelled

16   T-H-E-B-E-A-U.

17                       **DIRECT EXAMINATION**

18   ***Q.  (BY MR. KAPSAK:)*** Good afternoon.

19   *A.*  Good afternoon.

20   *Q.*  Officer Thebeau, where are you currently employed?

21   *A.*  With the Granite City Police Department.

22   *Q.*  And are you actually currently also working with the Drug

23   Enforcement Administration?

24   *A.*  Yes.

25   *Q.*  In what capacity?

1    *A.*  As a full-time task force officer.

2    *Q.*  What do you do as a task force officer?

3    *A.*  The majority of the time it is interdiction on the

4    interstate.

5    *Q.*  How long have you been doing that?

6    *A.*  Approximately three years.

7    *Q.*  When you say interdiction as your job with DEA, what does

8    that mean, interdiction?

9    *A.*  To summarize it is just basically trying to intercept large

10   narcotic shipments from a supplier to a buyer and trying to

11   intercept large sums, currency going back from the buyer back

12   to the supplier.

13   *Q.*  In your job as a Granite City police officer and as a task

14   force officer with DEA, have you had the occasion to take part

15   in the search of vehicles for illegal narcotics?

16   *A.*  Yes.

17   *Q.*  And have you mainly done this following traffic stops of

18   vehicles?

19   *A.*  Yes.

20   *Q.*  How many times in your career, both as -- working as a

21   Granite City police officer and with DEA -- would you say that

22   you have recovered illegal narcotics from vehicles?

23   *A.*  Hundreds.

24   *Q.*  Hundreds of times?

25   *A.*  Hundreds.

1   Q.   What types of narcotics have you recovered over the course

2   of that time?

3   A.   Various, probably known illegal narcotics; marijuana, black

4   tar heroin, cocaine, LSD.  Various -- you name them, I've found

5   them.

6   Q.   In your experience, where inside of vehicles have you

7   recovered illegal narcotics?

8   A.   Simply in the luggage, under seats, glove boxes, center

9   consoles, trunks.  Most of my experience before this one was in

10  the general areas of the vehicles before this guy.  In semis we

11  also have found large sums in the rear and the front also.

12  Q.   Now, in your experience and your training, do individuals

13  sometimes secrete drugs in hidden compartments in vehicles?

14  A.   Yes.

15  Q.   Now, during the course of your time with DEA and as a

16  Granite City police officer, have you had any training

17  regarding the placement of illegal narcotics in secret

18  compartments in vehicles?

19  A.   Yeah.  We had two different schools, a DEA class and an ICE

20  class.  The ICE class being the most recent, which was last

21  year during the summer.

22  Q.   What did you learn from those trainings specifically about

23  the secreting of drugs in secret compartments in vehicles?

24  A.   That the larger narcotic shipments could come in a

25  vehicles, could come hidden in natural void compartments or

1    actually constructed void compartments.

2        And we actually went out onto the parking lot with vehicles

3    that had been seized that actually had hidden compartments in

4    them and part of the class was to learn where these

5    compartments were and to find them.

6    Q.  Where did you learn those compartments could be?

7    A.  They could be simply what we refer to as a suicide load,

8    where you simply find it in a trunk, laying on the back seat,

9    You can find it in the back of a semi, find it in the cab of a

10   semi, or it could be either in a constructed trap or in a

11   natural void trap inside the vehicle, which could consist of a

12   trap where they remove the air bag and use that as a trap.  It

13   could be in the center console, underneath the center console.

14   It could be in the exhaust tunnel, there's a trap placed

15   underneath the block off that -- underneath the car.  They can

16   use that.  They can use the firewall, they could use a false

17   floor, they could use false seats, they could use a raised

18   floor in the trunk.  They can hide it in the spare tire, they

19   can hide it in the drive shaft, any of the tires that are on

20   the vehicle.  Numerous places.

21   Q.  What about rocker panels?

22   A.  And even on the rocker panel.

23   Q.  Did you learn that in your training as well?

24   A.  Yes.

25   Q.  Now, during the course of these trainings what, if

1    anything, did you learn can be used to help seal compartments

2    such as rocker panels or attached panels of any kind where

3    drugs are secreted in?

4    *A.*  I know in training they taught us that they can use

5    different chemicals to actually use to mask the odor of the

6    narcotic and they can use certain chemicals to help reattach

7    whatever they remove to reattach.

8    *Q.*  What types of chemicals were you made aware of?

9    *A.*  Anywhere from coffee grounds to masking odors to silicone

10   to caulk to reattach stuff, Bondo to do the body work to

11   replace the parts they tore up to try to conceal the void.

12   *Q.*  At least a few of the ones you just mentioned, do they tend

13   to give off a chemical odor?

14   *A.*  Yes.  I was taught that, yes.

15   *Q.*  Now, in addition to these trainings, what else have you

16   done to educate yourself to learn from your peers and

17   colleagues about how drugs are often secreted in vehicles?

18   *A.*  We frequent every night a Web site for police officers

19   across the country and Canada that they post their findings on

20   there.  And that goes into detail of the actions, the

21   indicators to look for and the voids where these drugs or

22   currencies were found.

23   *Q.*  And from that Web site from the work of people like

24   yourself.  Police officers, people who work with DEA, where

25   have you learned drugs can often be secreted in vehicles?

1   *A.*   As I mentioned before, various places throughout the

2   vehicle.   If there is a void, if they can construct a void they

3   will find a place to hide it, including the rocker panel.

4   *Q.*   Officer Thebeau, I want to direct your attention to

5   November the 13th of 2009, just a few months ago.   Were you

6   working in your capacity that day as a DEA task force officer?

7   *A.*   Yes.

8   *Q.*   What specifically were you doing that day.

9   *A.*   Interdiction.

10  *Q.*   Who were you working with that day?

11  *A.*   Officer Todd Huskey from the Troy Police Department.

12  *Q.*   Where exactly were you conducting your interdiction that

13  day?

14  *A.*   It was Interstate 55/70, approximately the 18-mile mark.

15  *Q.*   What city were you near that day?

16  *A.*   Troy.

17  *Q.*   Troy, Illinois?

18  *A.*   Yes.

19  *Q.*   Did you make any traffic stops that day?

20  *A.*   Yes.

21  *Q.*   How did that come about?

22  *A.*   We were initially working north of the construction of 162,

23  which was near Troy, so we were turn around in the turnaround

24  on the interstate, about the 18, and continued north on 55.

25  And at first and had not really noticed Mr. Saucedo in his

1    vehicle.  At one point we noticed that the driver, who appeared

2    to be alone, kept reaching to the right, which drew my

3    attention to him and made me suspicious.  He did this several

4    times reaching toward the right.  I thought he was hiding

5    something or he was reaching for something.  I wasn't sure, but

6    I was sure curious of what he was doing.

7    Q.  Were you directly behind this vehicle when you saw this?

8    A.  Yeah, at this time we were directly behind him.

9    Q.  Describe what the vehicle looked like that you were behind.

10   A.  A white Pontiac Grand Am with an Indiana registration.

11   Q.  Now, where did this vehicle continue to?

12   A.  He continued on northbound 55 toward the Chicago area.

13   Q.  Did the vehicle eventually come to another highway?

14   A.  He went past the ramp for 70 eastbound and apparently he

15   missed his turn because he veered sharply to the right and went

16   across the median, which was an obvious violation of the

17   traffic law.

18   Q.  What exactly -- what traffic law was violated at that time?

19   A.  Proper lane usage.

20   Q.  What happened when you saw that?

21   A.  We immediately effected a traffic stop right there on the

22   ramp.

23        MR. KAPSAK:  Your Honor, may I approach the witness?

24        THE COURT:  Sure.

25   Q.  Officer Thebeau, I'm going to show you what's been marked

1    for Government's identification purposes as Government's

2    Exhibit 1.

3        Do you recognize that picture?

4    A.   Yes.

5    Q.   What is that picture?

6    A.   It appears to be Mr. Saucedo's car at the time of the

7    traffic stop.

8    Q.   That's a fair and accurate representation as to what

9    Mr. Saucedo's vehicle looked at on November 13th 2009?

10   A.   Yes.

11        MR. KAPSAK:  Government moves for the admission of

12   Government's Exhibit 1.

13        THE COURT:  No objection?

14        MR. SCHULTZ:  No objection, your Honor.

15        THE COURT:  It will be admitted.

16        (Exhibit Gvt 1 received in evidence)

17   Q.   (BY MR. KAPSAK:)  Officer Thebeau, after you made the stop

18   of this vehicle, what did you do next?

19   A.   I approached from the passenger's side.  That's my normal

20   course approaching the vehicle.  It's safer for me.  And it

21   appeared that he was probably expecting me to come up on the

22   driver's side, so I knocked on the window, on the passenger

23   window to have him roll it down.

24   Q.   Now, you're describing someone who eventually opened that

25   window, is that fair to say?

Direct Examination - Thebeau, Kevin

1    *A.*  I knocked on the window.  He looked over.  I motioned for

2    him to roll the window down.  It took him several tries to find

3    the button to roll the window down.  His hands were shaking.  I

4    guess he was really nervous because he couldn't find the

5    button.  Several seconds went by before he was actually able to

6    find the button to roll the window down.

7    *Q.*  Now, the person you are describing whose hands were shaking

8    you said having trouble rolling down this window, do you see

9    that person here in the courtroom today?

10   *A.*  Yes, Mr. Saucedo seated over there with his attorney.

11   *Q.*  At counsel table; is that correct?

12   *A.*  Yes.

13   *Q.*  That's the person you saw that day?

14   *A.*  Yes.

15        *MR. KAPSAK:*  Your Honor, can -- please let the record

16   reflect a positive identification of the defendant by the

17   witness.

18        *THE COURT:*  The record will so reflect.

19   *Q.*  Now, let's just talk about his demeanor for a second.  You

20   said the defendant's hands were shaking; is that fair to say?

21   *A.*  As he was trying to find the button to roll down the window

22   his hands were noticeably shaking.

23   *Q.*  There came a time when he rolled down that window

24   successfully?

25   *A.*  Yes.

Direct Examination - Thebeau, Kevin

1   *Q.*  Did you inform the defendant as to why you had stopped his

2   vehicle?

3   *A.*  I advised him if he knew why I had stopped him and he said,

4   yes, he knew why and he explained that he simply missed his

5   exit.

6   *Q.*  What did you request from him next?

7   *A.*  His driver's license.

8   *Q.*  What did you come to learn was his name and where did you

9   come to learn he was from, the defendant?

10  *A.*  His Indiana driver's license identified him as Jose

11  Calvo-Saucedo.

12  *Q.*  Where did the defendant tell you -- actually, let me ask

13  you did you ask him where he was coming from?

14  *A.*  Yeah, I did.  I asked him what his travel plans were, I

15  asked him where he had been, where he was coming from.  And he

16  said he was visiting a friend in St. Louis.

17  *Q.*  Who did the defendant tell you that this vehicle belonged

18  to?

19  *A.*  I asked him if it actually belonged to him because I was

20  kind of curious why he couldn't roll the window down and he

21  said it belonged to him.

22          *THE COURT:*  Could I just stop you.

23          You are having this conversation with him.  You are

24  obviously speaking in English and he is understanding and

25  replying to you in English, correct?

1          *THE WITNESS:*  Yes.

2     **Q.  (BY MR. KAPSAK:)**  What, if anything, did you notice about

3     the defendant's -- his mannerisms, his demeanor while you were

4     speaking to him at that point in time?

5     *A.*   I noticed that his breaths were short and rapid, like he

6     was having trouble breathing.  Obviously nervous to me.  It

7     looked like he was unshaven and his shirt was untucked.  He

8     looked pretty dirty.  The inside of the car was pretty dirty.

9     *Q.*  Did you have a chance to look inside the vehicle as you

10    were speaking with him?

11    *A.*   Yes.

12    *Q.*  What, if anything, did you notice inside his vehicle as you

13    were speaking to him?

14    *A.*   Some fast food items from McDonalds, some newspapers laying

15    around, his Mexican passport laying on the seat, and a couple

16    packs of cigarettes that appeared to be Spanish writing on the

17    packaging.

18    *Q.*   Now, Officer Thebeau, did he say anything about his keys?

19    *A.*   I remember that the key was one key.  And in training they

20    had also taught us that that might be an indication of

21    something illegal.  Could mean that this was a drop car where

22    he simply dropped the car and leave in a taxi or walk away,

23    somebody comes later and picks the car up.

24    *Q.*   Let's back up for a second and look at this collectively.

25    I think you just testified that you saw kind of an unkempt

1  appearance?

2  A.  Right.

3  Q.  You saw a Mexican passport also --

4  A.  Correct.

5  Q.  -- is that right?

6     Fast food wrappers?

7  A.  Right.

8  Q.  And you noticed something about his keys.

9     Collectively what did this signify to you, if anything, if

10 anything?

11 A.  That possibly something illegal.

12 Q.  Such as what?

13 A.  Illegal narcotics.

14 Q.  That he was carrying those?

15 A.  Yes.

16 Q.  Now, he had just also told you, I think you testified, that

17 he had come from St. Louis --

18 A.  Correct.

19 Q.  -- is that correct?

20 A.  Correct.

21 Q.  Seeing a Mexican passport, did that cause any concern with

22 you about that?

23 A.  Made me suspicious in that I don't know why you would need

24 a Mexican passport if you were in St. Louis.

25 Q.  Now, in addition to that, did you notice anything that

Direct Examination - Thebeau, Kevin

1    stood out besides what was inside the vehicle and anything

2    about his appearance?

3    A.   When I first approached the car and he initially rolled

4    down the window, after he found the button, there was a

5    distinct chemical odor coming from inside the car.  It wasn't

6    coming outside because I couldn't smell it outside.  I couldn't

7    smell it until he rolled the window down.

8    Q.   How strong was the smell when he rolled down the window?

9    A.   It was a distinctive smell that I can't associate it with

10   anything else rather than say it was a chemical smell that

11   smelled similar to silicone caulk-type material.  The intensity

12   of whatever it was was coming and going because the wind is

13   always blowing on the interstate, so...

14   Q.   What conclusion did you draw at that point from smelling

15   this silicone-like substance, the chemical odor what

16   conclusion, if anything, did you draw from that?

17   A.   That by looking around the car nothing appeared to be fixed

18   or repaired.  And either he was using that as a masking agent

19   to block the scent of the narcotics from a dog or he used that

20   product to actually help him reattach whatever he had removed

21   to conceal the narcotics.

22   Q.   So you were suspicious at this point of that; is that fair

23   to say?

24   A.   Yes.

25   Q.   Now, is that based upon your training that you would think

1    of this chemical being used for?

2    *A.*  There was talking in the ICE class that any time you smell

3    a chemical odor that you should look more deeply into it to see

4    if there is possibly illegal narcotics.

5    *Q.*  And you noticed nothing off the bat that that could be used

6    for, like a silicone-like product that was giving off the smell

7    as you looked around the car?

8    *A.*  Right.

9    *Q.*  Now, after you noticed all of these things, what happened

10   next with the defendant?  What did you do?

11   *A.*  I just simply told him I would issue him a warning for the

12   violations since he missed his exit and I returned to my

13   vehicle.

14   *Q.*  What happened when you returned to your vehicle?

15   *A.*  I gave the license to Officer Huskey from Troy PD.  He does

16   the computer work.  And I asked him to run him and do a

17   criminal check, history check.  And after he was done I issued

18   the warning.

19       While we were doing a computer check and writing the

20   warning, I couldn't understand why Mr. Saucedo was nervous

21   because he kept fidgeting around in the seat, looking in the

22   mirror, turning around looking at us.

23   *Q.*  You were parked behind him?

24   *A.*  Yes.

25       So I became suspicious wondering why he was still nervous

1    if he was simply just going to be issued a warning, let him go

2    on his way why he was still so nervous.

3    Q.  And that stuck out to you as well; is that fair to say? zzz

4    A.  Yes.

5    Q.  Now, you are back in your squad car and you write up the

6    warning there; is that fair to say?

7    A.  Yes.

8    Q.  What happens next?

9    A.  Get out of the car and ask Mr. Saucedo to step out of the

10   car and to the rear of the passenger side for safety reasons to

11   issue his warning.

12   Q.  Did you do so?

13   A.  Yes.

14   Q.  What happened then?

15   A.  We released him and told him he was free to go.  He turned

16   around to walk away and I asked him if I could talk to him for

17   a minute.  And he turned around, came back said yes.

18   Q.  What did you say then?

19   A.  I asked him if there was any illegal narcotics or large

20   sums of currency in the vehicle and he said no.

21   Q.  Why did you ask him that question?

22   A.  Because I believe that he may have had something there

23   because all the indicators, or red flags, or clues that pointed

24   to that he may have something in there.

25   Q.  So you asked him that question and he replied no; is that

1    correct?

2    A.   Yes, he replied no.

3    Q.   What did you say to him then, if anything?

4    A.   I said can I search your vehicle.  And he said yes.

5         And I said do you understand what I'm asking?  Do you

6    understand what search means?  And he said yes.

7    Q.   So he gave you oral consent to search the vehicle; is that

8    fair to say?

9    A.   Yes.

10   Q.   Upon giving you oral consent to search his vehicle, did he

11   ever tell you that you could only search certain parts of the

12   vehicle?

13   A.   No.

14   Q.   Did he never tell you that there were certain parts of the

15   vehicle, though, that you did not have his consent to search?

16   A.   No.

17   Q.   At this point in time, did you produce a written consent to

18   search form to him at all?

19   A.   No.

20   Q.   Why not?

21   A.   It's just a general search.  That's what I start out with

22   is just a general search of the interior of the vehicle.

23   Q.   When you say a general search, what do you mean?

24   A.   Places that are easily accessible to me.  Like under the

25   seats, luggage, glove box, center counsel, rocker panels,

1    anything that is easily accessible to me.

2    Q.  Did you anticipate having to do any type of intrusive

3    search initially?

4    A.  No.

5    Q.  Anything that would cause damage or destruction to the

6    vehicle?

7    A.  No.

8    Q.  It's all part of your general search; is that right?

9    A.  Yes.

10   Q.  Now, as began -- you then proceeded to search the inside of

11   the vehicle; is that correct?

12   A.  I believe the normal course is I look in the glove box and

13   look in the center counsel, check the luggage.  At the same

14   time we are looking for more clues for something that may be

15   hidden even deeper in a hidden compartment.

16   Q.  Do you recall if there was any containers in the vehicle?

17   A.  I believe there was maybe a suitcase or bag that was in

18   there.

19   Q.  In the general area of the car; is that correct?

20   A.  Probably in the back seat.

21   Q.  You mentioned the glove compartment as well; would that be

22   fair to say?

23   A.  Yes.

24   Q.  Did you ever search the trunk?

25   A.  I don't believe we had gotten to the trunk at that point.

1    *Q.*   As you were searching the interior of the vehicle, did you

2    notice any smell inside the vehicle?

3    *A.*   Yeah, the chemical odor was still there.  It was coming and

4    going, just depends on the wind.

5    *Q.*   It was noticeable inside the vehicle?

6    *A.*   It was noticeable.

7    *Q.*   Where did your search inside the vehicle take you to?

8    *A.*   There's an area, rocker panel area there is a small rubber

9    strip there which is held on by clips.

10   *Q.*   Around what part of the car?

11   *A.*   When you open your door and you look down, right there next

12   to the seat is the rocker panel area.

13   *Q.*   Okay.  Now, you mentioned that you came to a rocker panel

14   inside the vehicle?

15   *A.*   Yes.

16   *Q.*   Which side of the car?

17   *A.*   The passenger's side.

18   *Q.*   When you got to that side of the vehicle, was that chemical

19   odor still apparent?

20   *A.*   Yeah, it was still there.

21   *Q.*   When you got to that area, to this rocker panel area what

22   did you do when you got there?

23   *A.*   Pulled out my pocket knife and popped open the rubber

24   strip, popped it off.

25   *Q.*   There are -- there is a strip that covers the top of that

1    panel?

2    A.  Yeah, it is one piece.  The clips are attached to the

3    rubber strip and you simply pull it out and it's made to pop

4    off.

5    Q.  Why did you go ahead and remove that rubber strip with the

6    clips on it from the top of the rocker panel?  Why did you do

7    that.

8    A.  In the training we were taught that this is a common area

9    used to conceal narcotics and things.

10   Q.  And you mentioned this smell, this chemical-like smell was

11   still prevalent in the area?

12   A.  It was still prevalent in that area.

13   Q.  Now, when you removed that strip, that rubber strip that

14   was covering the rocker panel area on the passenger's side,

15   okay, describe for the Court what you saw.

16   A.  I saw like there's three little holes where the clips came

17   from.  And usually you can shine your light in one of the holes

18   and look in another to see if the void is there.  Usually on

19   most cars there is a natural void there.

20   Q.  Officer Thebeau, I'm now going to show you what's been

21   marked for identification purposes as Government's Exhibit 2.

22   Please take a look at that picture.

23       Do you recognize what is in that picture?

24   A.  Appears to me Mr. Saucedo passenger's side of his vehicle

25   after I removed the strip.

1   *Q.  Is that a fair and accurate representation as to what that*
2   *rocker panel looked like on December 13th 2009, passenger side*
3   *of the defendant's vehicle?*
4   *A.  Yes.*
5        *MR. KAPSAK:  Government moves for the admission of*
6   *Government's Exhibit 2.*
7        *MR. SCHULTZ:  No objection, your Honor.*
8        *THE COURT:  Admitted.*
9            *(Exhibit Gvt 2 received in evidence)*
10       *MR. KAPSAK:  May I publish this exhibit to the Court?*
11       *THE COURT:  Please.*
12  ***Q.  (BY MR. KAPSAK:)*  Officer Thebeau, can you say that on that**
13  *monitor in front of you?*
14  *A.  Yes.*
15  *Q.  This is the passenger's side rocker panel; is that correct?*
16  *A.  Correct.*
17  *Q.  Please if you would describe to the Court what encompasses*
18  *this area here (indicating).*
19      *First let me ask you, this strip has been taken off at this*
20  *point; is that correct?*
21  *A.  Correct.*
22  *Q.  And what is it that's underneath there?*
23  *A.  Usually this is just a natural void inside the holes you*
24  *see there.*
25  *Q.  Yes.*

1    *A.*  Natural void that's boxed in.

2    *Q.*  The little holes there on the side, is that where the clips

3    went down into?

4    *A.*  Correct.

5    *Q.*  Now, after you removed that rubber strip, what did you do

6    to continue your search in this area?

7    *A.*  Well, shortly before I continued the search Officer Huskey

8    approached and said that Mr. Saucedo is becoming increasingly

9    nervous while I was in that door area.  I took out my pocket

10   knife, I stuck it in one of these holes here and retrieved some

11   white powder that was on the tip of the knife.

12   *Q.*  So you used a knife to put in there; is that correct?

13   *A.*  Correct.

14   *Q.*  Just so we're clear, you put the knife into those

15   openings --

16   *A.*  Yeah, I'm not sure which one it was, but one of these I

17   stuck my knife into and pushed it down into the hole.

18   *Q.*  Now, let's back up for a second.  You mentioned that

19   Officer Huskey came up to you as you were searching in this

20   rocker panel area; is that correct?

21   *A.*  Correct.

22   *Q.*  Please tell the Court exactly how that came about and at

23   what point during the course of your search Officer Huskey

24   approached you.

25   *A.*  He said as I was searching the door area he became

1   increasingly nervous, but he had not advised me of that until

2   after I removed this strip.

3   Q.  Did he tell you at what point specifically the defendant

4   started becoming nervous?

5   A.  He said as you got near the door area searching he had

6   become nervous.

7   Q.  Now, you mentioned a moment ago that you stuck your knife

8   into one of those openings, correct?

9   A.  Correct.

10  Q.  Took it out and what, if anything, did you notice?

11  A.  Some white substance on the tip of the knife.

12  Q.  Now, by the way, just for clarity, as you were searching

13  this area, putting your knife into that hole and removing the

14  rubber strip, did the defendant ever jump in and say, hey, you

15  are not allowed to search that area?

16  A.  No.

17  Q.  Now, you mentioned that white powder was on your knife.

18  What did you do after you noticed that?

19  A.  I walked back to where Mr. Saucedo was at the rear of the

20  car and asked him if it was cocaine or anything illegal.

21  Q.  How did he respond?

22  A.  He said no.

23  Q.  What did you do then?

24  A.  Well, I knew I wasn't going to let it go at that because I

25  believed it was something illegal, so I planned on a more

1  intrusive search.

2  Q.  You expected to expand your search, is that fair to say?

3  A.  Correct.

4  Q.  So because you intended to do that, what did that cause you

5  to do that?

6  A.  I filled out a written warning because I knew that this

7  more intrusive search could possibly tearing something up.

8  Q.  Let's be more specific.  You're saying intrusive, possibly

9  tearing something up.  What did you think at that point you may

10 have to do that required you to have him sign a written

11 consent?

12 A.  My next plan was to pull down on the ground effects

13 molding.  And I knew that this could probably maybe break it or

14 I wouldn't be able to reattach it at the scene.

15 Q.  Please tell the Court what ground effects molding is.

16 A.  It's simply a plastic or rubber plastic material that goes

17 underneath the rocker panel to make the car look sporty or

18 fancier.

19 Q.  And did the written warning specify that it may require the

20 opening or destruction of car panels?

21 A.  Yes.

22 Q.  And did the defendant in fact sign that document?

23 A.  Officer Huskey filled out the English portion of it.  When

24 I asked him if Mr. Saucedo had read and signed it, he said yes.

25 And I looked at it and saw that he had did that in English.

Direct Examination - Thebeau, Kevin

1  But I wanted to make sure that he understood, but I didn't have

2  any problems up to then believing but I wanted to cover, you

3  know, all bases to make sure he understood so I had him read

4  the Spanish and sign the Spanish consent too.

5  Q.  Was a test conducted on that substance that you found on

6  the --

7  A.  Yeah, at the -- initially when we found the white on the

8  tip of the knife Officer Huskey called Detective Newcomb from

9  the Troy Police Department to come out with a test kit for

10 illegal narcotics.

11 Q.  What was the result of any test that was conducted?

12 A.  We first used a cocaine swab.  It was our first choice.

13 And the swab turned instantly blue, which was a positive

14 indication for cocaine for that test.

15 Q.  Now, after the defendant had signed that written consent,

16 what did you do next with the vehicle while you were still at

17 the scene?

18 A.  While we were waiting for Detective Newcomb, I walked back

19 up and pulled down on the ground effects.

20 Q.  What, if anything, did you notice when you did that?

21 A.  It was clean, looked brand new caulk silicone-type material

22 that ran underneath of the ground effects molding when I pulled

23 it down.

24 Q.  Did it have an odor to it?

25 A.  It had the same odor that I believe was the same odor that

1    I initially smelled, yes.

2    Q.  Now, Officer Thebeau, why don't you take a closer look at

3    the picture.  And look at that area there where that rubber

4    strip had been.

5        What else can you tell the Court about that rubber strip?

6    Is it something that can easily be placed back on and snapped

7    back on after you took it off?

8    A.  Yes.  I've done this on similar vehicles hundreds of times.

9    It simply come off, they go back in the holes.  We push on

10   them, they snap back in.  We never had anybody's vehicle

11   damaged in that way or we have never received any complaints

12   that we have damaged their vehicle.

13   Q.  What did you use again to pop off that rubber strip?

14   A.  My pocket knife.

15   Q.  Now, after the defendant signed his written consent, and

16   you searched the vehicle, and you had the positive test for

17   cocaine what did you do with the defendant next?

18   A.  Advised him that he was under arrest for cocaine

19   trafficking and placed him under arrest.

20   Q.  What was done with the vehicle?

21   A.  We had it towed to ADR Towing, which is located in Troy,

22   Illinois.

23   Q.  And was it at that point, in fact, placed up on the

24   stand -- on a stand?

25   A.  Yes, it was lifted up on a rack.

1   *Q.*  Officer, I'm now going to show you what's been marked for

2   identification purposes as Government's Exhibit 3.

3       Sir, do you recognize what is in that picture?

4   *A.*  This appears to be Mr. Saucedo's car at ADR, on the rack

5   after I removed the ground effects molding on the driver's

6   side.

7   *Q.*  Is that a fair and accurate representation as to what the

8   bottom of that vehicle looked like when you put it on the stand

9   at the towing place November 13th 2009?

10  *A.*  Yes.

11      *MR. KAPSAK:*  Government moves for the admission of

12  Government's Exhibit 3.

13      *MR. SCHULTZ:*  No objection, your Honor.

14      *THE COURT:*  Admitted.

15          *(Exhibit Gvt 3 received in evidence)*

16      *MR. KAPSAK:*  Your Honor, permission to publish

17  Government's Exhibit 3.

18      *THE COURT:*  Sure.

19  ***Q.  (BY MR. KAPSAK:)***  Officer Thebeau, can you see what this

20  picture shows on your monitor?

21  *A.*  Somewhat yes.

22  *Q.*  It is a little hazy, just do the best you can.

23      Can you please tell the Court what you see on the bottom

24  part of that vehicle there?  What is that?

25  *A.*  Well, I know from training that they taught us to access

1    that void, that box void in this rocker panel which runs from

2    the rear of the front tire, which is at the far left of this

3    picture, and runs the entire length to the rear or the front of

4    the rear tire, which you see here on your right, that they will

5    have to cut a hole into this rocker panel somewhere along this

6    length.

7        So I scraped away at the white silicone-type caulk material

8    and can see a red material, which in my training they taught us

9    could be -- Bondo is commonly used to cover up that access

10   point after they reattach the metal that was cut away.

11   Q.  By the way, what side of the vehicle is this?

12   A.  This is the driver's side.

13   Q.  This is the side that you went to first?

14   A.  Yes.

15   Q.  Look towards the rear of that vehicle, if you would,

16   towards that back tire.  What do you notice there that stands

17   out back there?

18       Is there like an opening there?  Is that what you were

19   mentioning a minute ago.

20   A.  When I scraped away the white silicone, I could see a red

21   substance and I could see which looked to me like access point

22   into that rocker panel.

23   Q.  Officer Thebeau, after you scraped away this material as

24   you were saying, what did you do after that?

25   A.  I --

Direct Examination - Thebeau, Kevin

1   *Q.*  On the passenger's side -- on the driver's side rather?

2   *A.*  I pried down, pulled down I could see a dry wall screw that

3   was also used to hold the panel up.  He had actually cut three

4   points and left one point metal, so it would make like a flap.

5   So he simply replaced the flap up, use the dry wall screw, used

6   the Bondo to seal that and then used the silicone caulk

7   material to replace the ground effects molding to help it stay

8   up.

9       What I did was pry that access panel, pried it opened, and

10  then at that time observed these duct tape bundles smeared in

11  red axle grease-type material.  And I could see a rope-type

12  twine tied around the bundle.

13  *Q.*  Officer Thebeau, I'm now going to show you what's been

14  marked for identification purposes as Government's Exhibit 4.

15      Do you recognize what is in that picture?

16  *A.*  Yes.

17  *Q.*  What is that?

18  *A.*  That's shortly after I pried down on that panel.

19  *Q.*  And what do you notice in that panel?

20  *A.*  There is kilo-sized bundles, duct tape, which you can't see

21  from this photo because it is in black and white, but there is

22  a red substance smeared all over the duct tape.  There is

23  twine, so I simply pulled on this twine and each of the bundles

24  were attached to each other.  And all five -- there was five

25  that came out of the driver's side.

1  *Q.*  Is this a fair and accurate representation as to what those

2  bundles and the twine coming out of the panel on the driver's

3  side looked like?

4  *A.*  Yeah, that's a fair representation of the driver's side.

5       *MR. KAPSAK:*  Your Honor, government moves for the

6  admission of Government's Exhibit 4.

7       *MR. SCHULTZ:*  No objection, your Honor.

8       *THE COURT:*  Admitted.

9            *(Exhibit Gvt 4 received in evidence)*

10      *MR. KAPSAK:*  Permission to show the Court.

11      *THE COURT:*  Sure.

12 **Q.  (BY MR. KAPSAK:)**  Now, Officer Thebeau, if you can, please,

13 slowly if you could just explain to the Court exactly what it

14 is you see here in this picture coming out of that panel?

15 *A.*  This is what I believe to be a kilo-sized, duct tape

16 wrapped bundle with red grease smeared all over it.  And coming

17 up -- that's hanging down there's a twine that was attached to

18 this by the duct tape being placed around the twine.

19      And you can see right here where my finger is, this is one

20 side of the metal that was cut.  The backside was cut.  And the

21 other where you cannot see was cut.  Up here in the front

22 portion is the metal that he left to use it like a door, so it

23 simply came down and you could put it back up.

24      The actual metal here is the rocker panel metal that he cut

25 away.  It is not a replacement piece of metal.

Direct Examination - Thebeau, Kevin

1    *Q.* Officer Thebeau, how many of those bundles were moved from

2    the driver's side rocker panel?

3    *A.* Five.

4    *Q.* Five?

5    *A.* Five.

6    *Q.* Were they, in fact, tested?

7    *A.* Yes.

8    *Q.* What was the result?

9    *A.* All five tested positive for cocaine.

10   *Q.* After you completed the driver's side access panel search,

11   once this vehicle was up on the lift where did you look next?

12   *A.* The passenger side.

13   *Q.* The passenger side is where you initially removed that

14   rubber strip; is that correct?

15   *A.* Correct.

16   *Q.* Officer Thebeau, now I'm going to show you what's been

17   marked for identification purposes as Government's Exhibit 5.

18       Do you recognize what is in that picture?

19   *A.* Yes, this is a photo of the passenger side of that vehicle

20   after we took the ground effects molding off.

21   *Q.* Is that a fair and accurate representation of what that

22   vehicle looked like after the ground effects molding was

23   removed November 13th 2009?

24   *A.* Yes.

25          *MR. KAPSAK:* Government moves for the admission of

Direct Examination - Thebeau, Kevin

1    Government's Exhibit 5?

2            *MR. SCHULTZ:*  No objection, your Honor.

3            *THE COURT:*  Admitted.

4                *(Exhibit Gvt 5 received in evidence)*

5            *MR. KAPSAK:*  Permission to publish to the Court.

6    **Q.  (BY MR. KAPSAK:)**  Officer Thebeau, very quickly, if you

7    would, look again, is this the passenger side of the vehicle?

8    *A.*  Yes.

9    *Q.*  Now we're looking from back to front?

10   *A.*  Back to front, left to right.

11   *Q.*  What do you notice on the bottom of that vehicle there as

12   well?

13   *A.*  White silicone-type material.  And you can't really see it

14   here, but to the back on the left here you can see where the

15   access panel was.  It was obviously different than the rest of

16   the rocker panel so it led me to believe that this is where it

17   was cut out.

18   *Q.*  What is that material on the bottom there?

19   *A.*  The white stuff?

20   *Q.*  Yes.

21   *A.*  This is what I believe to be a silicone or caulk-type

22   substance.  From this picture you can't tell, but this looks

23   dirtier in the picture but actually this was fresh and clean.

24   It wasn't dirty at all.

25   *Q.*  You believe that was giving off a smell and odor as well?

1  *A.*  This was still giving off the smell, but the attention

2  really wasn't on the smell at that time.  The attention more

3  was what was in the rocker panel.

4  *Q.*  Now, tell us what happened -- did you then come to access

5  that rocker panel?

6  *A.*  I accessed that the same way I did the driver's side.

7  *Q.*  What did you find?

8  *A.*  Five more kilo-size type bundles.  It was the same

9  packaging; duct tape with the twine with the red grease smeared

10  on the duct tape.

11  *Q.*  I'm going to show you what's been marked Government's

12  Exhibit 6 for identification purposes.  Please take a look at

13  that picture.

14     And do you recognize what is in that picture?

15  *A.*  Yes, the passenger side after I started prying down and saw

16  one of the first bundles.

17  *Q.*  Coming out of that rocker panel?

18  *A.*  Yes.

19  *Q.*  Is that a fair and accurate representation as to what that

20  panel looked like once it was accessed on November 13th 2009?

21  *A.*  Yes.

22        *MR. KAPSAK:*  Government moves for the admission of

23  Government's Exhibit 6.

24        *MR. SCHULTZ:*  No objection, your Honor.

25        *THE COURT:*  Admitted.

1            *(Exhibit Gvt 6 received in evidence)*

2   *Q.  (BY MR. KAPSAK:)*  How many bundles were taken out of the

3   passenger side rocker panel?

4   *A.*  Five.

5   *Q.*  What was the total number of these bundles that was removed

6   from the car?

7   *A.*  Ten bundles all together.

8   *Q.*  And they in fact tested all of them?

9   *A.*  Yes, all ten bundles tested positive for cocaine.

10         *MR. KAPSAK:*  No further questions, your Honor.  Thank

11  you.

12         *THE COURT:*  You said that you have pulled these rocker

13  panels like hundreds of times and put them back without damage.

14  How routine is it for you to pull the rocker panels in cars

15  when you do these stops?

16         *THE WITNESS:*  Usually, your Honor, it is part of the

17  general search that I do.  It depends on how -- what type of

18  car it is because they're not all the same.  Some are actually

19  screwed down.

20         *THE COURT:*  So if they're screwed down, you wouldn't

21  do it?

22         *THE WITNESS:*  No.

23         *THE COURT:*  But if they have these kind of clips it

24  would be typical for you to do it?

25         *THE WITNESS:*  Yes, typical.  The screw down one -- I

Direct Examination - Thebeau, Kevin

1    have a tool called a density meter.  Which when it is screwed

2    down it is easier to use the density meter.  Just runs it on

3    the body, it actually penetrates the metal and returns a

4    reading that tells you -- and you get used to what a typical

5    reading is from that area and if it's higher than it should be,

6    it tells you there could be something in there.

7            *THE COURT:*  So I gather from your answer your standard

8    is based on whether or not you think you are going to inflict

9    damage on the vehicle.  If you can do it without inflicting

10   damage, you pop it up.

11           *THE WITNESS:*  The training taught us that if you think

12   you are going to tear something up, have them sign a consent.

13   If it's just going to be something that you don't anticipate is

14   going to get tore up, you are good with a verbal.

15           *THE COURT:*  Gotch ya.

16                          **CROSS EXAMINATION**

17   *Q.  (BY MR. SCHULTZ:)*  Officer Thebeau, I know you have been a

18   task force officer for three years now.  How long had you been

19   with the Granite City Police Department before you became a

20   task force officer?

21   *A.*   Twenty-one.

22   *Q.*   So all told you have been a law enforcement officer for

23   about 24 years now?

24   *A.*   No, it's a total of 21.

25   *Q.*   Total of -- so 18 years at the Granite City Police

Cross Examination - Thebeau, Kevin

1    Department?

2    *A.*  I'm still considered Granite City too.  I get paid by them.

3    Twenty-one all together.  Eighteen on the street in patrol.

4    *Q.*  All right.  I want to just touch briefly here initially on

5    some of the answer that you gave in your direct testimony.

6         Do you recall in response to the government's -- in

7    response to one of the government's questions that you said

8    prior to this search that you had found narcotics in the

9    general areas of vehicles?

10   *A.*  Yes.

11   *Q.*  And so I guess I would ask you prior to this search on

12   November 13th 2009, how many times had you found narcotics in

13   the rocker panels?

14   *A.*  Zero.

15   *Q.*  And so prior to November 13th 2009, you had indicated that

16   you had conducted hundreds of vehicle searches?

17   *A.*  Correct.

18   *Q.*  And so is it safe -- I apologize, I misstated my question.

19   The question I wanted to ask you, Officer Thebeau, was prior to

20   this search, you had found narcotics hundreds of times?

21   *A.*  Yes.

22   *Q.*  And so how many searches do you think you had to conduct of

23   vehicles to find narcotics hundreds of times?

24   *A.*  Over 21 years?  I can't do the math on that.

25   *Q.*  Well, every time you search you don't find narcotics; is

Cross Examination - Thebeau, Kevin

1    that fair to say?

2    A.   Sure.  And every time we stop a car we don't search either.

3    Q.   So if you have found narcotics hundreds of times, you have

4    probably searched hundreds of more cars?

5    A.   Oh, correct.

6    Q.   Prior to this search I know you have never found narcotics

7    in a rocker panel, had you ever searched a rocker panel prior

8    to this search?

9    A.   During the 18 years as regular patrol, no, I wasn't aware

10   of it.  But since working with DEA and having the training,

11   yes, searched several rocker panels in the same manner as we

12   searched this one.

13   Q.   So several, would you say you have searched two to three or

14   how many?

15   A.   No, hundreds.

16   Q.   So you have conducted hundreds of rocker panel searches

17   prior to this one but never located any narcotics?

18   A.   Correct.

19   Q.   In respect to the training that you have on vehicle

20   searches with the DEA, do you recall when you underwent that

21   training?

22   A.   That was 2007.  I'm not really sure on the date.

23   Q.   How many days was that?

24   A.   Three I believe.

25   Q.   And were all three days assigned to vehicle searches?

1    *A.*  No, I believe -- I can't remember exactly what was taught

2    but tractor trailers, was a focus more on tractor trailers,

3    which contain rocker panels too.

4    *Q.*  And then with the ICE training, I know that was last

5    summer, do you recall how many days that was?

6    *A.*  I believe that was a three-day also.

7    *Q.*  You had indicated in all your prior searches where you had

8    found narcotics in the general areas of vehicles that would be

9    called the suicide load?

10   *A.*  Yeah.  We believe that where they simply put it in the back

11   seat, or the trunk, or the luggage the officers refer to it as

12   a suicide load.

13   *Q.*  And you also as part of your training you learned that

14   there were certain odors that would make an officer suspicious?

15   *A.*  Yes.

16   *Q.*  And you had indicated and I was surprised that coffee was

17   one of those.

18   *A.*  Coffee grounds.

19   *Q.*  So if you stop someone and you smell coffee, that's an

20   indicator that they're moving large quantities of narcotics?

21   *A.*  One piece of the puzzle, yes.

22   *Q.*  This stop that you conducted was part of a task force drug

23   interdiction operation; is that fair to say?

24   *A.*  Yes, sir.

25   *Q.*  Do you have a certain game plan that you follow during

Cross Examination - Thebeau, Kevin

1    these traffic stop encounters?

2    *A.*   Stop vehicles based on probable cause and see if there's

3    any indicators that might...

4    *Q.*   Do you -- when you have probable cause to make the stop, do

5    you always issue only a warning traffic citation?

6    *A.*   I wouldn't say always, but 99 percent of the time it is

7    just a warning.

8    *Q.*   And it's then after you -- then after issuing the traffic

9    warning you then -- I assume you always tell the person they're

10   free to leave?

11   *A.*   Yes.

12   *Q.*   And then it's at that point that you would ask for consent

13   to search?

14   *A.*   Right.

15   *Q.*   And part of the reason you issue a warning is a person's

16   more likely to consent or be agreeable if they've just gotten a

17   warning ticket than an actual traffic citation?

18   *A.*   Yeah.

19   *Q.*   That's part of the thinking that goes into it, right?

20   *A.*   Right.

21   *Q.*   Because you want to create the impression that you are a

22   friendly police officer just issuing a traffic citation?

23   *A.*   That's right.

24   *Q.*   And the question I had when you approach a car, do you

25   identify yourself as Officer Thebeau with the Granite City

1    Police Department or do you say I'm DEA Task Force Officer

2    Thebeau?

3    A.   No, I usually just Officer Thebeau.

4    Q.   Do you indicate your affiliation?

5    A.   No.

6    Q.   And again, that's calculated on your part as well?

7    A.   Yes.

8    Q.   If you told them you were with the DEA, they probably

9    aren't going to want to let you search the car?

10   A.   More than likely.

11   Q.   And after you issue the warning citation, you indicated in

12   your report and I believe you testified to this, that you then

13   release the driver to go on about his business?

14   A.   Correct.

15   Q.   What's the significance of that from your perspective?

16   A.   We have been taught in training that they have to feel that

17   they're free to leave.

18   Q.   Right, because as a task force officer and certainly as a

19   Granite City Police Department you had a lot of training about

20   the limitations of the Fourth Amendment in the context of

21   traffic stops?

22   A.   Correct.  He has to be released from that initial stop and

23   anything after that has to be consensual.

24   Q.   Is it fair to say that the only guidance that you had

25   during your 18 years as a Granite City Police Department on the

1    limitations of vehicle searches was the Fourth Amendment

2    itself?

3    *A.*   Right.

4    *Q.*   There is no written policy about what you can or can't do

5    as a Granite City police officer with regard to searches?

6    *A.*   Just follow the Fourth Amendment.

7    *Q.*   So is it fair to say since the Fourth Amendment is your

8    only guide in these types of searches that you are very

9    familiar with the Fourth Amendment?

10   *A.*   Very familiar?  I believe that during the 18 years I've

11   become familiar with it.

12   *Q.*   I would think so.

13       Just one additional question then about the general vehicle

14   searches.  I'm correct that while you are conducting a traffic

15   stop if you observe cocaine on front passenger seat or a bag of

16   marijuana, a pistol, you don't have to ask for consent to

17   search that car?

18   *A.*   Right.  Probable cause.

19   *Q.*   Right.  So if you have probable cause, you don't need

20   consent you know that?

21   *A.*   Correct.

22   *Q.*   And the whole traffic stop, the moment of truth is the

23   moment at which you ask the driver for permission to search

24   your car?

25   *A.*   Correct.

1    *Q.* And you have a written consent form that you carry with you

2    as a DEA task force officer; is that correct?

3    *A.* Correct.

4         *MR. SCHULTZ:* Your Honor, may I approach the witness?

5         *THE COURT:* Sure.

6    ***Q. (BY MR. SCHULTZ:)*** Officer Thebeau, I'm handing you what's

7    been marked Defendant's Exhibit 2. Is that the standard

8    consent to search form that the DEA uses?

9    *A.* Yes.

10   *Q.* Is that in fact the consent to search form that you used on

11   November 13th 2009?

12   *A.* I believe the handwriting and the English portion is

13   Officer Huskey's from Tory Police Department because I had

14   asked him initially to fill it out and give to it Mr. Saucedo

15   to fill out. And then I read it and saw that he read the

16   English portion, but I wanted to make sure that he understood

17   it, so I did the bottom portion.

18   *Q.* Fair to say that's the consent to search form that

19   Mr. Calvo signed off on?

20   *A.* Yes.

21        *MR. SCHULTZ:* Your Honor, at this time I would move

22   for the admission of Defendant's Exhibit 2.

23        *MR. KAPSAK:* No objection.

24        *THE COURT:* Admitted.

25             *(Exhibit Dft 2 received in evidence)*

1    *Q.  (BY MR. SCHULTZ:)*  With respect to that consent to search
2    form, it is both in English and in Spanish?
3    *A.*  Correct.
4    *Q.*  Do you speak any Spanish?
5    *A.*  No.
6    *Q.*  You were aware that Mr. Calvo's first language is Spanish?
7    *A.*  If that's what he means by speak Spanish and some English,
8    yes.
9    *Q.*  Did you think that English was his primary language?
10   *A.*  English?
11   *Q.*  Yes.
12   *A.*  No, I didn't believe that.
13   *Q.*  In fact, you knew and it's in your report that he spoke
14   very limited English?
15   *A.*  Did I say that in the report?
16   *Q.*  Would you like to see your report?
17   *A.*  Could you just point it out to me.
18      At the initial stop he said he spoke Spanish and some
19   English.  Is that what you are referring to?
20   *Q.*  Right, is it fair to say that you knew that he spoke
21   Spanish and some English?
22   *A.*  Yes.
23   *Q.*  And you have indicated, I believe in your testimony, that
24   you -- he had some concerns about how well he understood your
25   English?

1   A.   Sure.

2   Q.   Right.  I mean because when you saw that you had signed --

3   that he had signed the English portion of the consent to search

4   form you said, well, wait a second, we better have him sign the

5   Spanish?

6   A.   I believe at the time if we did find something he might use

7   that against us.  So...

8   Q.   Sure.  Did you read that Spanish portion to him?

9   A.   No.

10  Q.   Did Officer Huskey?

11  A.   No.

12  Q.   So did he read that out loud?

13  A.   No.

14  Q.   Do you know if he is literate?

15  A.   I do not.

16  Q.   When you ask for a consent to search, do you always seek

17  simply oral consent at first?

18  A.   Not always.

19  Q.   But here in this case, you did just ask for verbal consent?

20  A.   Yes, sir.

21  Q.   You could have approached him with the consent to search

22  form, you chose not to do that?

23  A.   Yes.

24  Q.   The reason for that again is it's probably easier I've

25  asked based on your experience to get someone to consent

Cross Examination - Thebeau, Kevin

1   verbally as opposed to in writing?

2   A.   Just depends on the circumstances.

3   Q.   Well, why in this circumstance didn't you approach him with

4   the --

5   A.   Just anticipated a general search at the time.

6   Q.   When you stopped the defendant initially, were you driving

7   a squad car?

8   A.   Yes.

9   Q.   And it wasn't clear from the reports but was Officer Huskey

10  in the squad car with you?

11  A.   Yes.

12  Q.   Would that be a Granite City Police Department --

13  A.   That is what we refer to as a semi-marked unit.  It has

14  lights but no markings on it.

15  Q.   Does it have video recording capabilities?

16  A.   No.

17  Q.   And is it part of the DEA's standard operating procedures

18  that task force officers would work in pairs?

19  A.   That is -- I don't know if that's a DEA protocol.

20  Q.   Well, in your capacity as a task force officer, do you

21  usually work with another officer?

22  A.   Yes, that's for safety reasons.

23  Q.   For safety reasons.  Is that because you are not able to

24  safely search a car with a driver standing there without

25  observation?

1    *A.*  Correct.

2    *Q.*  You don't want to turn your back to a driver that you have

3    just pulled over?

4    *A.*  Correct.

5    *Q.*  In fact, you even worry about what he's doing with his

6    hands while you are standing on the side of the road?

7    *A.*  Correct.

8    *Q.*  So you hadn't patted down Mr. Calvo, had you?

9    *A.*  No.  That fell on Officer Huskey, he was watching

10   Mr. Saucedo.  I was --

11   *Q.*  Do you know whether Officer Huskey had patted him down?

12   *A.*  I'm not sure if he did or not.

13   *Q.*  But would you describe Officer Huskey's role in this

14   traffic stop as primarily to provide safety for you while you

15   conducted this search?

16   *A.*  Yes, his department is an equal member in this.  And his

17   primary role on that stop was for backup and to simply assist

18   in the search and the...

19   *Q.*  What I'd like to do now is I'd like to show you what I've

20   got marked as Defendant's Exhibit 1A, which is a demonstrative

21   exhibit.

22   *A.*  It's a what?

23   *Q.*  Demonstrative exhibit.

24       I'm going to give you my pen, Officer Thebeau.

25       Do you see that's essentially a very primitive overhead of

Cross Examination - Thebeau, Kevin

1    a car?

2    *A.*   Is this a photo depicting the underneath of a car?

3    *Q.*   It is an overhead.  You see it is a rectangle, you see

4    where the tires are correctly?

5    *A.*   Okay, so it is an overhead depiction of a vehicle.

6    *Q.*   Very basic.

7    *A.*   Okay.

8    *Q.*   But what I'd like you to do, if you could, is to mark where

9    you were located with a T when you were examining the rocker

10   panel.

11   *A.*   Where I was?

12   *Q.*   When you were examining -- yes.  And let me be more

13   specific:  When you were examining the passenger's side front

14   rocker panel.

15   *A.*   Where I was?

16   *Q.*   Yeah.

17   *A.*   Near the rocker panel.

18   *Q.*   Yeah.  Okay.

19   *A.*   (Complying.)

20   *Q.*   And would you also mark on that where Officer Huskey was

21   located.

22   *A.*   (Complying.)  That's where I believe he was at.

23   *Q.*   Okay.  And to the best of your knowledge could you mark

24   where the defendant was located.

25   *A.*   Okay.  (Complying.)

1  *Q.*  Officer Thebeau, I apologize this is my error.  I see that

2  you have marked all the spaces with Ts.  So if you could, would

3  you indicate the spot where Officer Huskey was with an H and

4  the spot where the defendant was with a C?

5  *A.*  (Complying.)  That's initially where I thought they were.

6  I mean they could have moved around during the search.

7  *Q.*  All right.  Just in --

8       *MR. SCHULTZ:*  Is it all right, your Honor, if I put

9  this on the overhead?

10       *THE COURT:*  Sure.

11  ***Q.  (BY MR. SCHULTZ:)***  And so with the markings that you have

12  given, it would appear that it's your understanding that

13  Mr. Calvo would have been standing closer to you than

14  Officer Huskey while you performed this search?

15  *A.*  Is that what you get from this photo?

16  *Q.*  It appears as if the C, which stands for Mr. Calvo, is

17  closer to the T, which stands for Officer Thebeau?

18  *A.*  I'm up by the passenger's door and Officer Huskey and

19  Mr. Saucedo were at the rear of the car.

20  *Q.*  Okay.  But they were off to the side too?

21  *A.*  Yeah, they're farther away.  He is farther away from me

22  then he is Officer Huskey.

23  *Q.*  They were off -- they were standing on the same side of the

24  car that you were?

25  *A.*  Yes.

1   *Q.*  They weren't standing at the rear of his vehicle?

2   *A.*  It could have -- they started out there.  They could have

3   moved back and moved around a little bit.  But I'm focused on

4   what I'm doing, so I'm not watching them every second.

5   *Q.*  Right.  You would agree with me Officer Huskey's not going

6   to let the client get between him and you?

7   *A.*  I hope.

8   *Q.*  I mean the idea is that Officer Huskey is supposed to be in

9   between you and the driver, in this case Mr. Calvo, at all

10  times?

11  *A.*  Correct.

12  *Q.*  Because he's supposed to stop the person from being able to

13  make a lunge at you if that's what they were inclined to do?

14  *A.*  Yes.

15  *Q.*  But it's your testimony again, since you were conducting

16  the search, that you were not particularly watching exactly

17  where Mr. Calvo or Officer Huskey was?

18  *A.*  Correct.

19  *Q.*  Now, in your report and I believe in your testimony today

20  that you've documented a number of observations on your part

21  that caused some suspicion.  First, it was that Mr. Calvo was

22  unshaven and dirty?

23  *A.*  His car was dirty.  He appeared to be dirty, his shirt was

24  untucked.

25  *Q.*  That he was breathing rapidly and taking short breaths?

1    A.   Yes.

2    Q.   And you know as a police officer that a traffic stop for a

3    driver of a vehicle is an anxious few moments?

4    A.   I believe that.  He could be nervous simply because of

5    being stopped by the police.

6    Q.   Right.  As nice as a person -- as nice as people as you and

7    Officer Huskey are if you get pulled over by it's probably not

8    a pleasant experience?

9    A.   It could be nerve racking for anybody.

10   Q.   Right.  Your concern is also as officers about your safety

11   because you don't know the person you are stopping, correct?

12   A.   Correct.

13   Q.   You had never seen Mr. Calvo before you pulled him over?

14   A.   No.

15   Q.   Some of the other observations that caused suspicion were

16   the cigarettes with Spanish writing, correct?

17   A.   It's what I thought was Spanish writing.  I'm not sure what

18   it was.

19   Q.   But you did see a Mexican passport?

20   A.   Yes, sir.

21   Q.   One of the things you also pointed out was the single key

22   in the ignition?

23   A.   Yes, sir.

24   Q.   Now, correct me if I am wrong, but Mr. Calvo was able to

25   provide you with registration information which showed it was

1    his vehicle?

2    A.  I think he actually told me it was his vehicle, yes.

3    Q.  All right.  So that is at odds with a single key ignition

4    -- let me ask you if I understand the premise of why a single

5    key ignition is suspicious.  It is because you assume that this

6    person has no connection to the car other than he is going to

7    drop it somewhere and someone else is going to get it?

8    A.  Could be one of them.  Could be that his normal mode of

9    transportation is at home with the rest of his keys in case he

10   gets arrested then the police don't have access to the keys to

11   his other -- his home or his other vehicles, which they might

12   connect dots.

13   Q.  But the information you had based on his representation was

14   that that was in fact his car?

15   A.  I believed it was his vehicle.

16   Q.  The other observation that you then made that caused

17   suspicion was that the car was messy, that there was food

18   wrappers in the car?

19   A.  Yes, sir.

20   Q.  Finally, and perhaps most importantly from your

21   perspective, you had noticed a chemical odor, correct?

22   A.  Yes.

23   Q.  And I believe you said that you would simply describe it as

24   a chemical odor not necessarily the smell of silicone?

25   A.  I've used silicone and caulk a few times.

1   *Q.*   Let me ask you about that because silicone comes in caulk

2   forms.   What kind of caulk are you talking about if not

3   silicone caulk.

4   *A.*   I'm not sure, sir.   I know they come in a variety of kinds

5   of different chemical makeups.   I'm not a expert on caulk or

6   silicone.   I'm not sure.

7   *Q.*   Is it fair to say -- and I think you have indicated as

8   much, it was based upon these observations that I've just

9   listed that you believed he might be -- possibly be involved in

10  illegal activity?

11  *A.*   Yes, sir.

12  *Q.*   I think you said on your direct testimony not just illegal

13  activity but that you thought he was involved in narcotics?

14  *A.*   Yes.

15  *Q.*   Now, why would you think narcotics based upon those

16  suspicious observations as opposed to let's say marijuana?

17  *A.*   Well, I refer to that as the same.

18  *Q.*   Do you think that -- so you make no distinction between

19  couriers of marijuana or couriers of narcotics?

20  *A.*   It's all the same to me.

21  *Q.*   It's all the same to you.   There's no different things that

22  you are looking for with respect to different types of

23  offenders?

24  *A.*   Could be large sums of currency, could be anything illegal

25  that may arise out of a stop.

Cross Examination - Thebeau, Kevin

1  *Q.* Right. So you don't know if it was narcotics or maybe

2  firearms that he had in the car?

3  *A.* Sure.

4  *Q.* You just had an inkling based upon these six or seven

5  observations that there was something illegal going on?

6  *A.* An inkling? That's your word. That's not my word.

7  *Q.* How do you describe it?

8  *A.* Strong indication. I believed by the way he was asking and

9  some of the indicators that he was involved in illegal

10  narcotics. That's what I believed at the time.

11  *Q.* But again --

12  *A.* Why narcotics and not firearms? I believe that the Mexican

13  passport made me think of that more, but he had actually been

14  to Mexico and to me that would have been more the reasonable

15  thing that it was narcotics instead of firearms.

16  *Q.* Okay. And I believe you described you have testified that

17  you had strong indication that he was involved in narcotics.

18  And so what I would ask you then is are you testifying that

19  based upon these observations you felt you had probable cause

20  to arrest Mr. Calvo?

21  *A.* No, not at that time.

22  *Q.* Because you would agree with me that if you had probable

23  cause, you wouldn't need Mr. Calvo's consent, correct?

24  *A.* So you are saying that before we even asked him to search?

25  *Q.* Correct.

Cross Examination - Thebeau, Kevin

1    *A.*  Well, if we had probable cause I wouldn't have even asked

2    him to search.

3    *Q.*  I want to just ask you a series of questions concerning

4    this chemical odor and what you know about silicone.  I believe

5    you testified that you didn't see any legitimate uses of

6    silicone in the car?

7    *A.*  I didn't see no caulks or tubes of silicone laying around,

8    right.

9    *Q.*  But did you know that silicone is most of the time used in

10   a legal fashion in vehicles?

11   *A.*  Do I know that?

12   *Q.*  Yeah.

13   *A.*  I believe from that smell that that's what I was believing,

14   yes, from my training that that's where the smell was coming

15   from.

16   *Q.*  Right.  But I'm asking you if you know based upon your

17   training that there are many legal uses --

18   *A.*  Legal uses.

19   *Q.*  -- on automobiles.  There is a reason you might use

20   silicone in your car and it might not be that you are moving

21   large shipments of narcotics --

22   *A.*  Yes.

23   *Q.*  -- would you agree with that principle?

24   *A.*  Yes.

25   *Q.*  And for example, did you know if you have a leaky window

Cross Examination - Thebeau, Kevin

1    that you want to use silicone to repair the rubber stripping

2    around your windows?

3    A.  I don't know that.

4    Q.  That wasn't part of your training?

5    A.  No.

6    Q.  Did you know that if you have a leaky trunk that the way

7    you would repair it would be to use silicone to repair the

8    rubber stripping in your trunk?

9    A.  No.

10   Q.  Did you know if you had a crack in your dashboard that the

11   way you fixed it would be using silicone?

12   A.  Yes, I know that.

13   Q.  And so when you say you didn't see any legal uses of

14   silicone, you are simply saying you didn't see a tube of

15   silicone sitting in the back of his car so you assumed that it

16   was for some illegal purpose?

17   A.  Yes.

18   Q.  I asked you this earlier concerning your removal of door

19   sill plates in vehicles.  Had you ever previously removed a

20   door sill plate on a 2003 four-door Pontiac Grand Am?

21   A.  I would have to check my records but I'm not sure, sir.

22   But you can tell by looking at it that it's not screwed down

23   because usually you can see the screws if they're screwed down.

24   And this type of vehicle if it's on top of the rocker panel

25   that it's usually held on by a simple what I refer to as

1  pressure clip.

2  Q.  What I would like to do now is I'd like to go ahead and

3  show you what I previously marked as Defendant's Exhibits 6

4  through 14.  Would you please take a minute and look at these

5  pictures.

6      Let me know when you have had enough time, Officer Thebeau.

7      All right.  And do you recognize those photos as being

8  photos of Mr. Calvo's 2003 Pontiac Grand Am?

9  A.  Yes.

10      MR. SCHULTZ:  Your Honor, at this time I would move

11  for the admission of Defendant's 6 through 14.

12      MR. KAPSAK:  No objection.

13      THE COURT:  Admitted.

14      (Exhibits Dft 6 through 14 received in evidence)

15  Q.  (BY MR. SCHULTZ:)  If you would just hold on to those for a

16  minute, Officer Thebeau.  And I would ask you a few questions

17  about that.  The first is with respect to the rocker panel, you

18  indicated you pried that up with a knife?

19  A.  Yes, sir.

20  Q.  How long would you say it took you to pry out that rocker

21  panel?

22  A.  A couple seconds.

23  Q.  If you would in the exhibits that you have in front of you,

24  Officer Thebeau -- I believe the exhibit numbers are

25  unfortunately on the back.  But I would like you to look at

1  Defendant's Exhibit No. 7.  Do you have that in front of you?

2     Okay.  And Defendant's Exhibit No. 7 has four photos on it;

3  is that correct?

4  A.  Yes, sir.

5  Q.  And would you agree with me that pictures A and B on that

6  on Defendant's Exhibit 7 show a picture of what you refer to as

7  the rubber strip on the passenger's front door rocker panel?

8  A.  Yes, it shows a rubber strip.

9  Q.  And would you -- I believe that to be the door sill plate.

10  But would you prefer that I refer to it as the rubber strip?

11  Would that be simpler?

12  A.  Yes.

13  Q.  But we are talking about the same thing at any rate.  And

14  this rubber strip is actually a piece of hard plastic paneling

15  that's clipped into the rocker panel?

16  A.  Okay.

17  Q.  I'm asking you.

18  A.  This is a hard rubber strip that's placed over the rocker

19  panel, yes.

20  Q.  And there is nothing suspicious about the way that that

21  rubber strip looks, correct?

22  A.  No.

23  Q.  And you know that the drugs that were ultimately found in

24  Mr. Calvo's car weren't placed there by removing that rubber

25  strip?

1    A.   Correct.

2    Q.   And then photos C and D on Defendant's 7, those show how

3    the plate would have appeared initially in the car?

4    A.   I believe so.

5    Q.   Well, do you believe so or is that how it looked?

6    A.   I don't recall how it looked at that time, because I don't

7    remember this blue truck.  I'm not sure what this truck had to

8    do with it.

9    Q.   I'm not asking you about -- I apologize.  I'm asking you

10   about the two lower photographs, C and D.

11   A.   I believe this was Mr. Saucedo's vehicle, yes.

12   Q.   And the strip -- I'm asking you specifically about the

13   location of that strip.  That's how it fits in the car,

14   correct?

15   A.   Correct.

16   Q.   If you would now, if you would look at Defendant's Exhibit

17   No. 9, which also has four photos labeled A, B, C, and D?

18   A.   Okay.

19   Q.   Would you agree with me that those photos are of the

20   underside of the rubber strip?

21   A.   Yes.

22   Q.   And as you have noted here in your testimony, that rubber

23   strip is held in by metal clips, correct?

24   A.   Correct.

25   Q.   And there's actually three metal clips on this rubber

1    strip?

2    *A.*   Correct.

3    *Q.*   Now, you had to remove all three of those clips to take the

4    rubber strip out?

5    *A.*   Correct.

6    *Q.*   Do you agree with me that photograph A in Defendant's

7    Exhibit 9 shows the location of all three of those clips?

8    *A.*   Yes.

9    *Q.*   You'd also agree with me that in photograph A only two of

10   the three metal clips are visible?

11   *A.*   Yes.

12   *Q.*   That the third metal clip is not there?

13   *A.*   Correct.

14   *Q.*   And that third clip corresponds to the hole in the rocker

15   panel which would be closest to the front passenger side tire?

16   *A.*   I can't tell from this photo.  But are you asking me if

17   this rear clip is missing?

18   *Q.*   I'm asking you, yeah, which hole that would correspond to?

19   That's my question.

20   *A.*   I'm not sure.

21   *Q.*   All right.

22   *A.*   I'm not even sure this is the same panel by looking at this

23   picture.  I didn't memorize how it looked.

24       But if you are telling me you took a picture of the rocker

25   panel plate that was on there then...

Pg. 63

1    *Q.*  Well, I think that's what you have previously testified to,

2    but I'll move on.  What I'd like to do is to go ahead and show

3    you Government's Exhibit No. 2.

4            *MR. SCHULTZ:*  And if it's all right, I'll just put

5    that on the overhead.

6    *Q.*  And here in Government's Exhibit No. 2 you can see -- do

7    you see that hole?  That's one of the clip holes, correct?

8    *A.*  Correct.

9    *Q.*  That's another clip hole, correct?

10   *A.*  Correct.

11   *Q.*  This is a third clip hole?

12   *A.*  Correct.

13   *Q.*  And in that picture you can see the metal clip broken off

14   in that clip hole, correct?

15   *A.*  Broken off.  I don't know if it is broken off or not.  It

16   simply probably popped off.

17   *Q.*  Well, at any rate, it's still lodged in that hole in the

18   rocker and the rubber strip's not?

19   *A.*  Yes.

20   *Q.*  And you would agree with me that when you are removing the

21   rubber strip, all three clips are supposed to stay on the

22   rubber strip?

23   *A.*  I would believe that they should, yes.

24   *Q.*  Now, getting back to Defendant's Exhibit No. 9, looking at

25   photo B, that's -- that shows the two of the metal clips up

1    close?

2    A.   Yes.

3    Q.   And you can see well enough to see that they have rust on

4    them?

5    A.   Yes.

6    Q.   And then photos C and D are pictures of the area on the

7    underside of the rocker panel where you would expect to find

8    the third clip?

9    A.   Correct.

10   Q.   And it's not there?

11   A.   Not there.

12   Q.   And would you agree with me that that portion of the rocker

13   panel is damaged?

14   A.   From these pictures I can't tell if it was damaged or not.

15   I don't recall it being damaged that day, no, sir.

16   Q.   Okay.  Well, the photo that you took that day shows the

17   clip broken off in the rocker panel hole?

18   A.   You are saying broken off and simply maybe just it was

19   there and we can replace it back on and the other portion would

20   slip right back into the clip.

21   Q.   Well, I'd like to now ask you about Defendant's Exhibit

22   No. 13, which we've previously admitted.  And that's a blown up

23   photo or close-up photo of what I've referred to as the third

24   rocker panel hole.  Do you see that?

25   A.   Yes.

1   *Q.*  And you can see clearly in a picture that there's a rusty

2   metal clip still in the hole?

3   *A.*  Yes.

4   *Q.*  And you can also see a piece of gray plastic in between

5   that rocker panel clip?

6   *A.*  If that's what you are saying it is.  I don't know what it

7   is.

8   *Q.*  Well, what do you think --

9   *A.*  If you are asking me if we damaged that thing on that day,

10  I will say no.  I don't believe that we damaged it on that day,

11  no.

12       But I see a rusty metal clip with something between it and

13  some yellow stuff to the right.

14  *Q.*  All right.  And you would agree with me that the piece in

15  there is gray colored?

16  *A.*  Dirty, gray.

17  *Q.*  Same color as the rocker panel or the rubber strip?

18  *A.*  Yes.

19  *Q.*  All right.  And I think you have testified to this already

20  but -- strike that.

21       Finally, with respect to the photos of the car, I'd turn

22  your attention to Defendant's Exhibit No. 14.  Do you have that

23  in front of you?

24  *A.*  Yes, sir.

25  *Q.*  You agree that that's a photo of where the third clip

1    should be?

2    A.   Yes.

3    Q.   And you agree with me that looks like it's damaged in that

4    photo?

5    A.   It looks like the backside may be damaged a little.

6    Q.   Moving on, I'd like to ask you about your actions after you

7    removed the rubber strip.  It's at that point then that you got

8    your flashlight out, correct?

9    A.   That's right.

10   Q.   And you shined your flashlight in one of the two holes?

11   A.   Correct.

12   Q.   We know it wouldn't have been the hole with the broken clip

13   in it.

14   A.   No.

15   Q.   And when you shined your flashlight into the hole, what did

16   you observe?

17   A.   Usually I shine it in one hole and you can look in another

18   and it should be -- most of the time in a similar car that's

19   hollow inside.

20   Q.   And that's my next question:  Do you know whether rocker

21   panels on Pontiac Grand Am 2004 four-doors is normally hollow?

22   A.   I believe vehicles of this size and this side make are

23   usually hollow, yes.

24   Q.   But you don't know that for a fact; is that fair to say?

25   A.   Correct.

1    *Q.* And looking at -- I guess looking back briefly at the

2    photos Defendant's 11 and Defendant's 12, those are close-up

3    photos of the two other rocker panel holes, correct?

4    *A.* 11 and 12 appear to be close-ups of the rocker panel holes.

5    *Q.* So it would have been one of those two holes that you

6    shined your flashlight in?

7    *A.* Yes.

8    *Q.* And it was based upon that that you felt it necessary to

9    poke the blade of your knife into that hole?

10   *A.* Yes.

11   *Q.* And so before you poked the blade of the knife into the

12   hole, you weren't sure what was in a rocker panel?

13   *A.* Correct.

14   *Q.* You didn't know if maybe Mr. Calvo had some custom work

15   done and he had had the rocker panel filled in himself?

16   *A.* Filled in with?

17   *Q.* With something to dampen the noise?

18   *A.* No.

19   *Q.* So that's why you took the additional step of inserting the

20   knife blade into the hole?

21   *A.* Correct.

22   *Q.* And when you pulled out the white powder, what did you

23   think that white powder was?

24   *A.* I thought it was cocaine.

25   *Q.* You ever found white powder in a car that wasn't cocaine?

1    *A.*  I don't recall finding cocaine in a car before.

2    *Q.*  Let me ask you about that.  The hundreds of times you found

3    narcotics, what kind of narcotics have you found?

4    *A.*  I found cocaine but it wasn't in this manner.

5    *Q.*  All right.  But -- okay, but based upon your training and

6    experience, Officer Thebeau, you believed it to be cocaine?

7    *A.*  My first instinct led me to believe that it was cocaine.

8    But I knew it could be something else, that's why we called for

9    the narcotics test kit.

10   *Q.*  All right.  Would you agree with me that once you found

11   this white powder that you believed to be cocaine that you no

12   longer needed Mr. Calvo's consent to search because you now had

13   probable cause?

14   *A.*  Correct.

15   *Q.*  And even though you didn't need his written consent -- his

16   consent at all at this point, it's at this point that you first

17   seek some kind of written consent to search?

18   *A.*  After finding the, uh, cocaine on the end of the knife?

19   *Q.*  Yes.

20   *A.*  Yes.

21   *Q.*  But it's at this very point that you, yourself, admit you

22   don't need consent, correct?

23   *A.*  Correct.

24   *Q.*  Well, because if he said, if he said to you, Officer

25   Thebeau, I've had enough of your search, I'm going to get back

1   in my car and leave, thanks for the warning citation, that

2   wasn't happening?

3   A.   No.

4   Q.   So the reason you asked for the consent to search is

5   because I believe even though you didn't need it, you wanted it

6   because you anticipated doing a more intrusive search?

7   A.   Correct.

8   Q.   And it was your understanding then, I assume, that this DEA

9   consent to search form permitted you to do a more intrusive

10  search than the general search that you had heretofore

11  conducted?

12  A.   Correct.

13  Q.   And would you agree with me that the specific language in

14  this more expansive consent to search form, the specific

15  language is that you would be able to -- "the search would

16  include the removal of any suspicious paneling or other vehicle

17  components"?

18  A.   Correct.

19          MR. SCHULTZ:   Your Honor, may I have just a minute?

20          THE COURT:   Sure.

21          MR. SCHULTZ:   I have no further questions of this

22  witness, your Honor.   Thank you.

23          THE COURT:   Any redirect?

24          MR. KAPSAK:   Yes, briefly, your Honor.   Thank you.

25                      **REDIRECT EXAMINATION**

1    *Q.  (BY MR. KAPSAK:)*  Officer Thebeau, just a few questions for

2    you.

3        You testified on the cross that prior to 2007 you never

4    searched any rocker panels --

5    *A.*   Correct.

6    *Q.*   -- is that correct?

7    *A.*   Correct.

8    *Q.*   Fair to say that's because you had not received any

9    training to that effect at that point?

10   *A.*   That's right.

11   *Q.*   I think you said around 2007 or so is when you first

12   received training and learned of this container, so to speak,

13   being used in vehicles?

14   *A.*   Concealment area, yes.

15   *Q.*   And that was from training that you learned that; is that

16   correct?

17   *A.*   Correct.

18   *Q.*   Now, let's talk for just a minute about why you issue

19   traffic warnings.  I think you mentioned on cross that there's

20   some reasons that may be psychology in effect with suspects.

21   Now, in addition to that, are any of the reasons why you issue

22   a written warning, you know, to try to gauge something?

23   *A.*   Usually we do the warnings -- usually advise the driver

24   that they're going to be issued a warning before I walk back to

25   the car to observe their actions during the time that we're at

1    the rear of the squad checking the driver's license status and

2    to see how he acts.

3    *Q.* If issued someone a warning and told them that essentially

4    they're not going to be getting a ticket, what do you expect to

5    see?

6    *A.* They should -- I believe they become more calm.

7    *Q.* Is that something that you typically see when you issue

8    warnings?

9    *A.* Yes.

10   *Q.* Let's talk about what happened on November 13th of 2009

11   after you issued the written warning to the defendant.  How did

12   he respond when you went back to your car?

13   *A.* He just kept looking in the mirror and fidgeting, turning

14   around in the seat looking at us.

15   *Q.* How would you describe his demeanor?

16   *A.* Nervous.

17   *Q.* When you conduct a traffic stop and you approach an

18   individual in a vehicle, are you required to say that you are

19   with DEA?

20   *A.* No.

21   *Q.* When you spoke with the defendant initially and through the

22   process of him giving you consent, did he appear to you to

23   understand when you asked him specifically for consent to

24   search his car?

25   *A.* He replied in English.

1    *Q.*  And how did he reply?

2    *A.*  Yes.  No.

3    *Q.*  Did he ever indicate to you that he couldn't understand the

4    written consent to search form?

5    *A.*  No, he actually read the English portion and signed it.

6    *Q.*  Did he ever tell you that he was illiterate?

7    *A.*  No.

8    *Q.*  Now, when you began a search of the vehicle, did he ever

9    tell you that he didn't agree to your accessing and searching

10   that rocker panel area?

11   *A.*  No.

12   *Q.*  Now, you testified that people are often nervous during the

13   course of traffic stops.  That's fairly typical; fair to say?

14   *A.*  Typical.

15   *Q.*  Now, is it typical for someone to have such difficulty

16   finding a button that rolls down the window to the degree that

17   the defendant had when you first started talking to him?

18   *A.*  No.  That's not typical for a regular traffic stop.

19   *Q.*  Now, let's talk for a minute if we can about that key.

20   Describe it again for the Court what training you received that

21   might give you an indication as to what a single key might be?

22   *A.*  It can simply mean that Mr. Saucedo had tooken his vehicle

23   to the source, left that vehicle there and had the rest of his

24   keys with him, could have simply meant that it was a drop car.

25   *Q.*  When you say a "drop car", what do you mean by a drop car?

Redirect Examination - Thebeau, Kevin

1    *A.*  That he would load the narcotics in the vehicle or the
2    currency, take that to a predetermined location, leave the car
3    there, say at a Wal-Mart general area.  Leave it, take a cab or
4    a bus and leave the area.  And at some other point somebody
5    would come and get in that vehicle.
6    *Q.*  Would it indicate to you that he is also in a hurry, that
7    he wants to get somewhere?
8    *A.*  Could.
9    *Q.*  Well, what other factors could substantiate that?
10   *A.*  His appearance.  I believe that if he was in St. Louis
11   visiting a friend, he could have shaved and tucked his shirt
12   in.  But he appeared dirty.
13   *Q.*  You also noticed the Mexican passport; is that correct?
14   *A.*  Correct.
15   *Q.*  Did that cause you concern that perhaps he wasn't coming
16   from St. Louis?
17   *A.*  I believed that he was initially in Mexico and not
18   St. Louis.
19   *Q.*  That Mexican passport, based on your training where have
20   you learned, if at all, where narcotics sometimes tend to
21   originate from?
22   *A.*  Mexico.
23   *Q.*  Now, you are in the business of drugs, correct?
24   *A.*  Correct.
25   *Q.*  So counsel was mentioning that you are looking for anything

1    illegal in a case like this, right?

2    A.   Right.

3    Q.   But your business is drugs, correct?

4    A.   Drugs.

5    Q.   You have been taught indicators, behavior, things

6    associated with the vehicle that might cause concern; is that

7    correct?

8    A.   Correct.

9    Q.   As you began and conducted your search and you first talked

10   with the defendant, were you seeing indicators that caused you

11   suspicions that drugs or large sums of money might be in this

12   vehicle?

13   A.   All the indicators I received were pointing to narcotics.

14   Q.   Now, counsel also mentioned and I think you testified on

15   cross that, in fact, silicone and chemicals of that nature can

16   be used for illegal purposes on vehicles; is that correct?

17   A.   Correct.

18   Q.   Based on your training, did you also learn that silicone

19   and similar chemicals can be used to help aid illegal purposes?

20   A.   Yes.

21   Q.   Such as what?

22   A.   Narcotics.

23   Q.   What with narcotics?

24   A.   They use the silicone caulk-type material to mask the odor

25   of the narcotic or they could use it to reattach whatever they

Redirect Examination - Thebeau, Kevin

1  took apart to help fasten it back.

2  Q.  You mentioned you saw no -- like a caulking gun or anything

3  like that in the vehicle.

4  A.  No.

5  Q.  Did you look around?  Did you notice any other legitimate

6  use for silicone or some similar chemical on that vehicle, the

7  defendant's vehicle?

8  A.  I looked around as we were talking.  I didn't observe any

9  noticeable repairs on the vehicle, no.

10  Q.  Did that increase your suspicion?

11  A.  Yes.

12  Q.  Officer Thebeau, I want to ask a few more questions about

13  that rocker panel.

14    You mentioned that you had to pop off clips; is that

15  correct?

16  A.  Correct.

17  Q.  You did so with your knife?

18  A.  Correct.

19  Q.  How quickly and easily did they come off?

20  A.  Comes off in a matter of seconds.  It comes off easy.  You

21  just --

22  Q.  Did you have to dismantle or cause destruction to any of

23  those door panels, anything around there to help get that strip

24  off for any reason?

25  A.  No.

Redirect Examination - Thebeau, Kevin

1  *Q.*  Now, counsel I think was using the term "broken off."  In

2  fact what happened is you pop them off; is that right?

3  *A.*  Correct.

4  *Q.*  Could they easily be popped back on?

5  *A.*  Yes.

6  *Q.*  Now, Officer Thebeau, if you believe that you were going to

7  have to conduct an invasive search by dismantling this area,

8  that rubber strip, would you have provided written consent at

9  that point in time to the defendant?

10  *A.*  If I believe it would be invasive, the normal course is to

11  ask for written consent.

12       *MR. KAPSAK:*  I have no further questions.  Thank you,

13  your Honor.

14       *THE COURT:*  Any additional cross?

15       *MR. SCHULTZ:*  Yes, your Honor, just briefly.

16                    **RECROSS EXAMINATION**

17  *Q.*  *(BY MR. SCHULTZ:)*  With respect to defendant's responses to

18  you in English, is it fair to say that his answers were brief?

19  *A.*  Yes.

20  *Q.*  Like one word answers?

21  *A.*  If I recall, to me they were.  I'm not sure of the

22  conversation between him and Officer Huskey.

23  *Q.*  All right.  So during --

24  *A.*  I don't believe that I was in St. Louis visiting a friend

25  is simple yes or nos.

1    *Q.*  I had asked you if it was, you know, concise.  And so you

2    are indicating that -- would it be fair to say that the longest

3    thing he said to you was I was in St. Louis visiting friends?

4    *A.*  I believe so.

5    *Q.*  And all the other conversation was extremely brief?

6    *A.*  If I can recall, I guess when he said I understand why you

7    stopped me, I missed my exit.

8          *MR. SCHULTZ:*  Thank you, Officer.  I don't have any

9    further questions.  Thanks a lot.

10          *THE COURT:*  Additional direct?

11          *MR. KAPSAK:*  No, your Honor.  Thank you.

12          *THE COURT:*  Thanks, Officer.  You can step down.

13          Any additional evidence for the government?

14          *MR. KAPSAK:*  No, your Honor.  Thank you.

15          *THE COURT:*  Defendant's evidence?

16          *MR. SCHULTZ:*  Your Honor, may I have just a moment to

17    consult with Mr. Calvo?

18          *THE COURT:*  Sure.

19              *(Attorney-client conferring)*

20          *MR. SCHULTZ:*  Your Honor, we would call the defendant

21    Mr. Calvo.

22          *COURTROOM DEPUTY:*  Sir, would you please raise you

23    right hand.

24          Do you solemnly swear that the testimony you are about

25    to give shall be the truth, the whole truth, and nothing but

Recross Examination - Thebeau, Kevin

1    the truth, so help you God?

2        *THE DEFENDANT:*  I do.

3            *(Answers given through interpreter).*

4                    **DIRECT EXAMINATION**

5    *Q.  (BY MR. SCHULTZ:)*  Mr. Calvo, I want to ask you just a few

6    questions about the search that was conducted of your vehicle

7    back on November 13th 2009.  I want to ask you where it is that

8    you were standing when the search of your vehicle was

9    conducted.

10   *A.*  I was in the back part of the vehicle.

11       *MR. SCHULTZ:*  Your Honor, may I approach the witness?

12       *THE COURT:*  Sure.

13   *Q.*  Don't mark anything yet.

14       I'd like to ask you where it is that you were standing when

15   Officer Thebeau was searching on the passenger's side of your

16   car.  Please mark where you were standing with an X.

17   *A.*  (Complying.)

18   *Q.*  Would you please mark where the other officer was standing

19   with an O?

20   *A.*  (Complying.)

21   *Q.*  With respect to the search that Officer Thebeau was

22   conducting on the passenger side of your car, what could you

23   observe from where you were standing?

24   *A.*  Very little.  Almost nothing.

25       *MR. SCHULTZ:*  I have no further questions, your Honor.

Direct Examination - Calvo-Saucedo, Jose Luis

1          I would just move for the admission of Defendant's 1B.

2          THE COURT:  Admitted.

3              (Exhibit Dft 1B received in evidence)

4          MR. KAPSAK:  Very briefly, your Honor.

5                        **CROSS EXAMINATION**

6    *Q.  (BY MR. KAPSAK:)*  Mr. Calvo-Saucedo, when the police

7    officer was searching your vehicle, you would agree with me

8    that at no time you told him to stop searching your vehicle?

9          MR. SCHULTZ:  I'm going to object, your Honor.  That's

10   beyond the limited scope of direct.

11         THE COURT:  Overruled.

12   A.  I never said anything.

13         MR. KAPSAK:  No further questions.  Thank you, your

14   Honor.

15         THE COURT:  Any redirect?

16         MR. SCHULTZ:  Nothing based on that, your Honor.

17         THE COURT:  Okay.  Thanks.  You can step down.

18         Any additional evidence?

19         MR. SCHULTZ:  No, that's all, your Honor.

20         THE COURT:  Okay.  Some argument from the government.

21   Let me ask you as you start your argument, the Supreme Court

22   case of Ross --

23         MR. KAPSAK:  Yes.

24         THE COURT:  -- you believe controls this case?

25         MR. KAPSAK:  Your Honor, I would say the Florida

1    versus Jimeno case would be more controlling.  I think Ross

2    provides some additional direction in terms of the scope of

3    consent.  And also it lays out the fact that a search is not

4    limited by the possibility that separate acts or entry may be

5    required to complete the search.

6          I think the Garcia case also from the Seventh Circuit

7    has a lot of sway here.  The government believes it actually

8    helps our case.

9          I think the standard here, your Honor -- I think

10   counsel would agree with this, at least per his brief -- is

11   that the standard for measuring the scope of a suspect's

12   consent under the Fourth Amendment is that objective

13   reasonableness.  In other words, what would the typical

14   reasonable person have understood by an exchange between the

15   police officer and the suspect in terms of consent.  That's

16   from Florida versus Jimeno.  And that case also puts forth that

17   in the context of an automobile search, an unqualified consent

18   to search gives police officers the authority to search

19   containers within vehicles which might contain drugs.

20         Now, in terms of the Ross case, I think it is helpful,

21   it lays out essentially that the reasonableness of the scope of

22   consent to search is defined by its express object.

23         I think when you take the facts here and apply it to

24   this case law, the government is convinced that it lends

25   credence to what the officer did and that, in fact, he did not

Argument, prosecution

1    exceed the scope of the consent that was given to him by the

2    defendant.

3         Now, when the defendant gave oral consent to Officer

4    Thebeau in this case he expressed no limitations upon that

5    consent.  And at no time during the course of this search did

6    he ever say stop or place any type of limitations.  He never

7    delimited along the way.

8         Now, the other important factor here is that the

9    defendant knew what Officer Thebeau would be looking for.

10   Officer Thebeau had asked him whether he had any illegal drugs

11   or money in the vehicle.  Now, the defendant replied

12   negatively, but because Officer Thebeau asked him he knew what

13   the express object of this search was going to be.  So the

14   government believes that it's objectively reasonable for

15   Officer Thebeau to look in places where drugs might be,

16   including containers and the fabric of the vehicle and, i.e., a

17   passenger door rocker panel.  Which eventually is where these

18   multiple kilograms of cocaine was found.

19        Now, the Garcia case I think is an important one

20   because it defines a little bit more succinctly the

21   intrusiveness of searches.  It basically helps to decide if

22   something was objectively reasonable.

23        The defendant points in the Torres case -- and that

24   case says that the consent to search does not include

25   permission to inflict intentional damage to places or things to

Argument, prosecution

1    be searched.  However, it does allow for nondestructive

2    searches.  I think that's the heart of this case, whether what

3    Officer Thebeau did can be considered a destructive act.  And

4    the government believes very strongly that it was not.  I think

5    this whole consent issue and what happened after Officer

6    Thebeau placed his knife into that opening are red herrings.

7    The essential issue is whether when he popped off that rubber

8    strip with his knife, the clips which led him to remove that

9    rubber strip, whether that was destructive.  And again, the

10   government believes it absolutely was not and that he did not

11   exceed the scope of his search when he did so.

12        Officer Thebeau dismantled the passenger side rocker

13   panel only after the defendant signed the written consent form

14   and probable cause existed to do so.

15        Now, I anticipate that counsel will argue that what

16   happened here by removing that rubber strip can be defined as

17   dismantling, or causing damage, or being overly invasive in

18   terms of the search, which then exceeded the scope.  But I

19   don't believe that's what happened here.  When you hear Officer

20   Thebeau describe during his testimony what actually took place,

21   he didn't have to break off essentially this panel.  He merely

22   used his knife to pop off the clips.  I think this --

23        THE COURT:  When does probable cause arise in this

24   case?

25        MR. KAPSAK:  I think probable cause -- I'll get to

1    that but maybe I can work it in here because it does tie in.

2          Probable cause I believe existed from the totally of

3    the circumstances.  You heard Officer Thebeau talk about how

4    there were several factors that caused him suspicion.  From the

5    very beginning when he is driving his vehicle, he's behind the

6    defendant he sees him reaching over.  That's the first time.

7    He then pulls him over, notices the nervousness, the trouble he

8    has in his vehicle finding the button to roll down the window.

9    That could happen to anybody.  Taken individually it may be

10   excusable, but taken collectively we have a problem.  So that

11   happens.

12         Now, he also smells this chemical odor.  As came out

13   during testimony, silicone or something similar can be used for

14   anything --

15         *THE COURT:*  I'm sorry for interrupting.

16         Let me ask you this:  Does probable cause arise even

17   before he takes off that strip?

18         *MR. KAPSAK:*  I believe it does that allows him to

19   remove that strip.

20         *THE COURT:*  Okay.  So if probable cause arises even

21   before he takes off that strip, then doesn't Ross make the case

22   even stronger?

23         *MR. KAPSAK:*  I believe it does, without question.  I

24   think either argument, consent to search and probable cause

25   gets the government passed the finish line, so to speak, here.

1  Because counsel, the defendant has argued from a exceeding the

2  scope of consent perspective I focused on that, but I do

3  believe that under a probable cause paradigm or consent to

4  search what Officer Thebeau did was fully justifiable in this

5  case.

6       Your Honor, I think another way to put this is to

7  distinguish it from the _Garcia_ case, because counsel looks very

8  closely at the _Garcia_ case and says that what happened here is

9  no less invasive to what happened in that case.  The government

10 disagrees.  What happened in that case the officers, upon

11 consent, fully had to take apart the door panels to get to the

12 marijuana that was inside that door.  There has to be

13 dismantling there, there has to be a truly invasive almost

14 damaging work on the part of those officers to get there.

15      I think if Officer Thebeau felt as though he had to do

16 that, he would have asked for written consent, which explicitly

17 states --

18      *THE COURT:*  Well, that's his testimony.  So his

19 position is and your position is that popping off this strip is

20 not invasive.  We don't reach invasive until we get to the

21 garage and you start really tearing things apart.

22      *MR. KAPSAK:*  Correct.  That's absolutely correct.

23      *THE COURT:*  So you take two tacts.  One is that this

24 is not invasive to pop off that strip and so probable cause

25 isn't part of the analysis at that point --

Argument, prosecution

1          *MR. KAPSAK:*  Right.

2          *THE COURT:*  -- or, alternatively, even if I were to

3   consider popping off that strip invasive, it doesn't matter

4   because probable cause enters the picture even before he takes

5   off that strip.

6          *MR. KAPSAK:*  Correct.

7          *THE COURT:*  And so Garcia covers you, <u>Ross</u> covers you

8   and you are good -- you are golden regardless.

9          *MR. KAPSAK:*  Yes, your Honor.  I think you have

10  summarized the government's argument very well.

11          And I just want to add one more thing.  I know that

12  this is an objective reasonableness test, but I think it's

13  important to look at it from the perspective of a police

14  officer.  Officer Thebeau, based upon his training and

15  experience, recognizes that should he have to do an invasive

16  search will provide that consent.  But what he was going from

17  the get-go was a general search.  Once he recognized that he

18  would have to take apart that ground effects molding and take

19  apart the panel, by that point he had then provided a written

20  consent, which covered, you know, dismantling of these access

21  panels.

22          You know, there's I guess a public policy argument to

23  be made here in some respect.  Police officers are the ones who

24  are out there dealing with this every day.  They have to make

25  split decisions and they do their best, as I think Officer

1   Thebeau does, to respect property and the Fourth Amendment.

2   But there also has to be some leeway with what's considered

3   dismantling or destroying or being invasive.  And I don't think

4   that's what happened with Officer Thebeau.

5        *THE COURT:*  Do you tie in that practical subjective

6   test of what the officer thinks is invasive with that whole

7   public policy argument or statement in Ross about this is,

8   after all, a -- and I can't remember the exact language that

9   Ross used but the essence is the practicality of either doing

10  the search now or positioning an officer there while you run

11  off and get a warrant versus letting the vehicle leave because

12  it's a dynamic crime scene, so to speak.  And so the question

13  is, how do you define invasive.  Do you define it by the

14  officer's subjective view, including my question of Officer

15  Thebeau that how often do you pop off these strips that cover

16  the rocker panel on the top side, is that routine or is that

17  something that is extraordinary.  And his answer was, well,

18  it's become routine if you can do it without damaging the

19  strip.

20        *MR. KAPSAK:*  No.  I think that that is certainly a

21  very important factor; what he's done and why he's had to do

22  it.  But I also think that Garcia really helps define what is

23  invasive.  In that case there is a destruction, there is a

24  dismantling of door panels to get the stuff.  There is an

25  affirmative invasiveness.  They had to take apart part of the

Argument, prosecution

1    car.

2            That didn't happen here.  And I think that's where the

3    important distinction is and I think that's why Garcia doesn't

4    help the defense here, I think it helps the government.

5            And on these bases, for all these reasons the

6    government believes what Officer Thebeau did was not beyond the

7    scope and we ask that you respectfully, respectfully ask that

8    you deny the defendant's motion.

9            THE COURT:  Okay.

10           MR. KAPSAK:  Thank you.

11           THE COURT:  Mr. Schultz.

12           MR. SCHULTZ:  Your Honor, while --

13           THE COURT:  Your main argument I guess is that this is

14   what -- that the issue about whether or not it's invasive is

15   more objective than subjective and that this was invasive and

16   we don't get to the probable cause issue until after the strip

17   has been ripped off by Officer Thebeau.

18           MR. SCHULTZ:  Correct, your Honor.  I guess in

19   response to the suggestion that there may have been probable

20   cause prior to Agent Thebeau actually seeing white powder on

21   the tip of his knife, I would suggest that this is a case where

22   at best there was reasonable suspicion.  And again, the facts

23   that have been before the Court is he was unshaven and dirty,

24   he had a pack of cigarettes with Spanish writing on them, a

25   Mexican passport, a single key in the ignition, several fast

Argument, defense

1    food items in a vehicle -- in the vehicle and this chemical

2    odor, which the officer acknowledged he couldn't distinguish

3    whether it was silicone or something else.  And I think for

4    that to be -- equate to probable cause, I just don't think that

5    that's supported by case law.

6         And I guess as a contrast I would say, your Honor,

7    surely this isn't as strong as evidence as you would have in a

8    situation where you have a drug dog perform a sniff and he

9    alerts for narcotics.  I mean it seems to me that the

10   government is somehow suggesting that this evidence is

11   comparable, that somehow the smell of silicone, for which there

12   are many uses -- and this idea that somehow because he doesn't

13   see how the silicone is used, well, I'd ask the Court to draw

14   on his common sense if someone is using silicone the areas that

15   would be used for legitimate purposes are not areas that would

16   be open to sight.  And so I think to rely so heavily on that

17   factor is unwarranted.

18        But more importantly, your Honor, you have a situation

19   where the government is suggesting the officer has probable

20   cause to believe in something as hard to define as illegal

21   activity.  I'm not familiar with cases, perhaps the Court is,

22   where there's just some probable cause that a crime was

23   committed.  Usually when you have probable cause, it's that a

24   specific offense was committed by a specific person.  And what

25   I believe is fair to characterize Officer Thebeau's impression

Argument, defense

1    is he had an inkling that something was wrong, he had

2    reasonable suspicion --

3            THE COURT:  Inkling was your word, as I recall.

4            MR. SCHULTZ:  Right, but I think that's a fair

5    assessment.  It was my word.  I think that's what it was, an

6    inkling that something was off and so he may have had

7    reasonable suspicion, but he certainly didn't have probable

8    cause.

9            And with respect to this issue of consent, your Honor,

10   when someone consents to a search of their vehicle there is

11   still a limitation on that consent.  There is a limitation on

12   everyone's consent.  And that is that the search would be

13   reasonable, that the search would be objectively reasonable.

14   And the officer has described searches he's conducted in the

15   past that he's always found the drugs in places where you would

16   maybe more readily find them, which is in the passenger

17   compartment, in the trunk, maybe under the hood.  He's never

18   found drugs in this rocker panel.

19           And it is significant, your Honor, that we are -- we

20   can parse the words, but to find those drugs Officer Thebeau

21   took a part of the car -- which I believe is correctly called

22   the passenger side door sill plate.  He removed that from the

23   car.  And so I would describe that as dismantling a part of the

24   car and say that that is no more permissible than dismantling

25   the side of the door -- than dismantling a door.

Argument, defense

1          I would also point out on top of this, your Honor,

2     that Officer Thebeau broke this door panel when he removed it.

3     It's obvious that one of the clips is stuck in there.  That he

4     indicates he popped it off, it took a couple of seconds.  And

5     you can see from the photos and it's clear all three clips

6     didn't come off.  Two of them did and one of them is still

7     stuck in the rocker panel.  And so you have a search here that

8     has not only dismantled a part of the car but broken it.  And I

9     don't think that that is within what would be considered an

10    objectively reasonable search.

11         I would also --

12         THE COURT:  So if it's clear under the case law that

13    in conducting a search, a general search on consent an officer

14    can look in a console or glove box, if in the course of doing

15    that the officer accidentally breaks the glove box door, he

16    just -- things on cars break, opens the glove box and breaks

17    that invalidates the search?

18         MR. SCHULTZ:  I'm not suggesting that.  But I'm

19    suggesting the primary argument here is that the simple removal

20    of that rubber strip is the Fourth Amendment violation in this

21    case, that he cannot do that based upon consent.

22         THE COURT:  But the officer testified that he removed

23    hundreds of these things, never a problem, never damaged, never

24    a problem.  If you also open a glove box, which is clearly

25    permissible under the case law, never damage you do it one time

Argument, defense

1    and all of a sudden that invalidates this search?

2         MR. SCHULTZ:  No, your Honor, I don't think that

3    breaking a console that a passenger would have access to and

4    that would be part of a normal consent search that that

5    would --

6         THE COURT:  So I guess my question is, why do you make

7    the point of the fact he broke the -- if in fact he did.  Quite

8    frankly, I don't think you have proven that he did.  But if in

9    fact he did, what's the point of that?  I mean --

10        MR. SCHULTZ:  Well --

11        THE COURT:  -- where does that take us?

12        MR. SCHULTZ:  I think the idea that a search that

13   damages a car that that would be objectively reasonable -- I

14   think to the extent that officers are performing searches based

15   on consent that lead to damage to the car that that would not

16   be objectively reasonable from a Fourth Amendment standpoint.

17        And so while I think above and beyond the door panel

18   being broken, a simple removal is a violation of the Fourth

19   Amendment.  I think the fact that the car is damaged in

20   connection with its removal makes this a more egregious

21   violation than if simply all three clips had been removed

22   properly.

23        THE COURT:  Okay.  Any other argument?

24        MR. SCHULTZ:  If I may just have a moment here, I

25   thought there was one additional point I wanted to try and

Argument, defense

1    make.

2          The final point I wanted to address, your Honor,

3    concerns the defendant's failure to object to this search.  The

4    officer's own testimony is that this removal of this panel only

5    took seconds.  And I would suggest to you that even had the

6    defendant had sufficient time or been in a sufficient place

7    where he could have seen this, that he wouldn't have been able

8    to object.  This isn't a situation where an officer pops the

9    trunk of a car and begins to walk, you know, from the front

10   driver's side area to the back of the car and someone can stand

11   up and say don't search that trunk.  The reality is this Fourth

12   Amendment violation, according to the officer's own testimony,

13   was accomplished in a couple of seconds.  And so I would

14   suggest to you that the defendant didn't have time to object.

15   And secondly, that based upon the defendant's brief testimony

16   and the exhibit we've submitted he couldn't have seen the area

17   that was being searched at that moment in time and so he can't

18   object to a search that he doesn't see occurring.

19         So for all those reasons I think that we have

20   demonstrated that a Fourth Amendment violation did in fact

21   occur here and I would ask that the evidence be suppressed.

22         *THE COURT:*  He clearly would have seen that the

23   officer was at the passenger side door.

24         *MR. SCHULTZ:*  He says --

25         *THE COURT:*  There's no question about that.

Argument, defense

1    Inferentially he says he saw little or nothing, but clearly he

2    would have seen that the officer is at the door.

3         *MR. SCHULTZ:*  Right.  But I guess my point is he can

4    search on the passenger's side, he can look under the seat, he

5    can look under the door mat.  But what he cannot do, at least

6    from the defense perspective, is to remove that door plate.

7    And I'm suggesting to the Court that Mr. Calvo was not in a

8    position to be to see whether he was searching under the door

9    mat or under the seat, or removing the door plate.

10        *THE COURT:*  He's in a position if the officer is at

11   the passenger's side door thinking to himself he's getting

12   hotter and hotter and hotter, I better put an end to this

13   search right now before he really gets to where he is going to

14   find it.

15        *MR. SCHULTZ:*  I don't think so, because I think it

16   gets back to my argument with the scope of consent and I think

17   that most people, including Mr. Calvo, who would consent would

18   never dream that an officer is going to pull out a knife and

19   start prying panels off the car based on a general consent

20   search.

21        *THE COURT:*  Most people don't commit crimes thinking

22   they're going to get caught.

23        *MR. SCHULTZ:*  Well, your Honor, at the point that

24   Officer Thebeau is performing this search, he doesn't have

25   probable cause.  He doesn't know what he is going to find in

Argument, defense

1    the car.   And the reality is it's not -- I don't believe the

2    Fourth Amendment analysis sways on whether the person who's

3    driving a car has drugs in his car or not.   The issue is, is

4    that search permissible, period.   And I think that it goes

5    beyond the scope when you start removing or dismantling panels

6    on the car.

7              THE COURT:   Gotch ya.

8              Mr. Kapsak, any rebuttal argument?

9              MR. KAPSAK:   No, your Honor.   Thank you.

10             THE COURT:   Well, just to make sure that we get all

11   our -- get all my Is dotted and Ts crossed, I'm going to take

12   it under advisement.   We will take it under advisement.

13             This case is set for trial -- May 3rd?   May 3rd.   That

14   setting stands.

15             Thank you, folks.

16                              -oOo-

17                    REPORTER'S CERTIFICATE

18       I, Molly N. Clayton, RPR, Official Court Reporter for the
     U.S. District Court, Southern District of Illinois, do hereby
19   certify that I reported with mechanical stenography the
     proceedings contained in pages 1 - 94; and that the same is a
20   full, true, correct and complete transcript from the record of
     proceedings in the above-entitled matter.
21             DATED this 21st day of May, 2010.

22

23                              *Molly Clayton, RPR*
                              _____
24

25